# SOLARI v. ALBERTINE—193 S. W. (2d) 111.

Western Section.   November 15, 1945.

Petition for Certiorari denied by Supreme Court, January 11, 1946.

Hanover & Hanover, of Memphis, for plaintiff in error.

Randolph & Randolph and Evans, Exby, Moriarty & Creson, all of Memphis, for defendant in error.

BAPTIST, J.   This suit was instituted by petition of Anthony J. Solari, in which it is alleged that Mary Solari, a citizen of Shelby County, Tennessee, died on May 4, 1944, leaving her grandchildren, Katherine Albertine, Rose Albertine, Mary Albertine, Alex A. Albertine, James G. Albertine and Anthony J. Solari surviving her.

That the said Mary Solari, prior to her marriage to the grandfather of the petitioner, was married to one Albertine and that as a result of said marriage, a son Alex L. Albertine was born; that the said Alex L. Albertine grew to manhood and was twice married; that Katherine, Rose and Mary Albertine were children by the first such marriage, and that Alex A. and James G. Albertine were children by his said second marriage.

That after the death of ——— Albertine, the decedent, Mary Solari, was married to the grandfather of the petitioner and as a result of that marriage Anthony J. Solari the father of the petitioner was born.

That the said Anthony J. Solari, father of the petitioner, predeceased his mother, Mary Solari.

That at the time of her death the said Mary Solari was the owner of certain real and personal property in Shelby County.

That on May 11, 1944, Mary Albertine presented the will in question in the Probate Court of Shelby County and the same was admitted to probate in common form; that Mary Albertine, who was named as executrix in said will, qualified as such executrix and is acting as such.

The petitioner avers that the said paper writing is not the will of Mary Solari on the grounds that at the time of the alleged making thereof, the said Mary Solari did not have sufficient mental capacity to make a will; and that if she did in fact make such will, she did so by the fraud and undue influence of Katherine, Rose and Mary Albertine.

The answer filed by Mary Albertine, executrix, denies the allegations that Mary Solari did not have sufficient mental capacity to make the will and denies that it was made by reason of fraud or undue influence of anyone.

In the Circuit Court a jury found that the ''paper offered is the last will and testament of Mary Solari, deceased.''

Upon this verdict judgment was entered that the said writing was the last will and testament of the testator.

The petitioner's motion for new trial was overruled and from that action the petitioner has appealed to this Court and assigned errors.

The first assignment of error is that there is no evidence to support the verdict.

The paper writing in question is as follows:

"Will of Mrs. Mary Solari"

"I, Mrs. Mary Solari, of Memphis, Tennessee, and fully understanding the disposition of my estate which I am about to make, do declare this to be my last will and testament, and I hereby revoke any and all wills heretofore made by me.

"Item I. I direct my executrix to pay all just debts which I may leave as soon after my death as the financial condition of my estate will justify.

"Item II. I give to my grandsons, Alex A. Albertine and James G. Albertine, Two Hundred Dollars ($200.00) each in cash to be theirs absolutely.

"Item III. I give to my son, Anthony J. Solari, Three Hundred Dollars ($300.00) in cash to be his absolutely. I do not now give my said son a larger share of my estate for these reasons: First, because heretofore from time to time I have been most generous to him and have heretofore given to him, or advanced or used for his benefit, money exceeding $20,000.00 in the aggregate; and secondly, it is my purpose and desire to make my three granddaughters the principal beneficiaries of my estate in consideration of the care, kindness and attention they have shown to me in my declining years.

"Item IV. In consideration of the individual and special care and attention which my granddaughter, Mary Albertine, has shown me, I give to her Five Hundred Dollars ($500.00) in cash to hers absolutely.

"Item V. All the remainder of my estate of whatever character and wherever situated I gave absolutely to my three granddaughters, Catherine Albertine, Rose Albertine and Mary Albertine, equally to be theirs absolutely.

"Item VI. Should any beneficiary under this will seek to contest it or to set it aside in any particular, then the one or ones so doing shall forfeit his, her or their rights

under this will, such forfeiture to become effective upon the filing of any such proceeding in court.

"Item VII. I appoint my granddaughter, Mary Albertine, the Executrix of this will and I waive the giving by her of any bond as Executrix.

"In witness whereof I have hereto affixed by signature at Memphis, Tennessee, on this May 29, 1939.

"Mrs. Mary Solari

"The foregoing writing was this day signed and acknowledged by Mrs. Mary Solari in our presence as her last will. At her reqest and in her presence and in the presence of each other we hereto sign our names as attesting witnesses.

"This May 29, 1939.

"Wassell Randolph
"Frank L. Kerns"

Mrs. Solari was about 75 years old at the time the will was executed.

The decedent Mrs. Mary Solari was born in Italy and came to America when she was between sixteen and eighteen years old. After she came to America she contracted a marriage with one Albertine and as a result of this marriage there was born a son, Alex Albertine, now deceased. This son was twice married and as a result of the first marriage three daughters were born Catherine, Rose and Mary Albertine, executrix in this case. As a result of this son's second marriage, two sons, Alex and Gary Albertine, were born.

Upon the death of her first husband the decedent was married to one Solari. Of this marriage there was born one son, Anthony J. Solari, now deceased, and who was the father of the contestant, Anthony J. Solari.

This marriage of the decedent to Solari ended in divorce, after which the decedent went to live with her son,

Alex Albertine, and his children until about 1928, when she went to live with her son, Anthony J. Solari.

Upon the death of decedent's son, Alex Albertine, it appears that his widow by the second marriage and the mother of the two boys, Alex and Gary, decided to make her home with her mother, taking to live with her the two boys. Thereupon Mrs. Solari made her home from that time, about 1931, and until her death with her three orphaned granddaughters.

The home in which the widow of Alex Albertine lived with her two sons adjoined the home in which Mrs. Solari lived with her three granddaughters and these five children grew up together in daily and intimate contact.

These three granddaughters were reared by Mrs. Solari, and we think it is evident that she was deeply devoted to them. The eldest Catherine, was prepared in stenographic work and has been employed in Nashville in that capacity for a number of years. The next in age, Rose, was educated in St. Agnes Academy, Memphis State Teachers College and Vanderbilt Universty and has been employed since that time as a teacher in the Memphis City Schools. The youngest, Mary Albertine, attended the Memphis State Teachers College for two years. She had taken a business course and had just completed the same when her grandmother suffered a stroke, and from that time until Mrs. Solari's death, Mary remained at the home. She testified that after she recovered from this stroke her grandmother requested her to remain with her.

This stroke occurred about July, 1938. From this she recovered and took up the management of her affairs.

Mrs. Solari was of very limited education, but evidently possessed a high order of intelligence and common sense. For many years she conducted a grocery store in

a building owned by her on South Wellington and by industry and thrift accumulated the estate in question.

She owned several pieces of real estate, which were acquired in 1939 by the United States Government in setting up what is known as the Foote Homes, a negro settlement, the price paid to Mrs. Solari being in the neighborhood of $10,000. While the negotiations for this sale were in progress, Mrs. Solari's son, Anthony Solari, went to the office of Mr. Wassell Randolph and entered into a discussion with Mr. Randolph as to the sale, and made the claim that his mother was not mentally competent to handle her affairs and he wanted in some way to be appointed her guardian, so he could handle the transaction and get control of that money and use it for her, claiming that she was in no condition to handle the money. Mr. Randolph refused to be a party of any such effort and stated to Anthony, that he, Mr. Randolph, knew that Mrs. Solari was perfectly competent to handle her affairs.

The evidence is that Mrs. Solari was devoted to this son, Anthony, and though the years had been indulgent and generous with him in financial matters; that she had furnished him with money in several business ventures and for other purposes.

In some manner the information came to Mrs. Solari of her son's effort to have her declared incompetent. She was not only hurt and humiliated, but was greatly incensed and embittered and as a result an estrangement followed between the mother and son.

On receipt of this information she went to the office of Dr. Edward Mitchell, who had been her physician for many years, to have his opinion as to her mental competency. She stated to Dr. Mitchell that she was anxious to make some disposition of her estate and was anxious that she be proven of disposing ability. Dr. Mitchell

made the requested examination and told her that in his opinion she was mentally capable. Dr. Mitchell had treated her at the time she suffered the stroke and testified it was the result of a hemorrhage in the brain, causing a right sided paralysis of the arm and leg; that at the time of her visit to his office her general condition was improved and approached the normal very closely; that she was much more capable than the average in taking care of her business.

Dr. Mitchell testified that he suggested to Mrs. Solari that, in addition to his expression of opinion, she consult Dr. Carroll Turner, who was a neurologist and have him pass on her mental condition, which advice was followed.

Dr. Turner testified as follows:

"Mrs. Solari was straightforward in examination as to the relation of certain facts regarding her case. She was not obtuse, she was lucid and clear. She was well oriented; that is knew where she was, and who she was, and the purpose of her examination. She had had no education, particularly, and therefore her general fund of information was very limited. She could name the Governor of the State, the Mayor of Memphis, and the President of the United States. She could name the officials who preceded these. Her power of calculation was in keeping with her few educational advantages. There was no memory defect for recent or past events. Her power of attention was not disordered, and there was no distractability. She could repeat four numerals forward then backwards. After two minutes she could repeat the four numerals forward, but not backwards. She could repeat simple test phrases, although her speech impairment made this somewhat difficult so far as articulation was concerned. Mrs. Solari can describe in detail

the location of her property, the means by which she acquired it, its approximate value, the number of buildings located on it, and how she would like to dispose of it. Her granddaughter was present during the conference, and I was able to check certain details by her to ascertain whether these tests given Mrs. Solari were correct. It is my opinion that Mrs. Solari is mentally competent to transact her own business. She has good insight, and I believe her judgment can be trusted so far as its quality is concerned. Her speech defect is the result of a stroke which she had several months ago and is in nowise an indication of a deficient mentality.''

These examinations occurred in May, 1939.

Mr. Wassell Randolph of Memphis had been Mrs. Solari's legal adviser for many years. Shortly after the medical examinations above referred to, Mrs. Solari had her granddaughter, Mary Albertine, to telephone Mr. Randolph that Mrs. Solari desired him to come out to see her. Mr. Randolph advised the granddaughter that he would be glad to come out and talk to her grandmother. We quote from Mr. Randolph's testimony:

''Q. Did you know then the purpose of your visit? A. I did not. Miss Mary did not tell the purpose of the visit, just said her grandmother wanted to see me. I went out to see her one afternoon on leaving work, and when I got there one of the young ladies admitted me to the house, and Mrs. Solari was setting there in the hall, and just as soon as I was admitted the young lady—I think it was Miss Mary—went upstairs and left Mrs. Solari and myself alone in the hall together, and then it was that Mrs. Solari told me that she wanted me to prepare her will. I then commenced questioning her to ascertain from her how she wanted her will drawn, and she went into considerable de-

tail in telling me what she wanted in her will. After discussing the matter with her for a considerable while I found that she wanted to make a rather simple will, so it was not necessary for me to take any notes, of what she wanted to put in her will, and after discussing the matter there with her probably forty-five minutes to an hour, I then left and told her I would prepare the will at the office and bring it back to her for execution.

"Q. Did she then tell you, or did you have a conversation with her about whom she wanted to witness the will? A. Yes, sir, I told Mrs. Solari that it was necessary for her to have at least two persons sign the will as witnesses, and I asked her whom she would like to have sign as witnesses. She very prompty said 'I would like for you to sign as one.' I said 'I will be glad to sign as one for you. Now, who else do you want?' She said 'Mr. Frank Kerns has been my agent for a long time. He knows me well and I know him well. I would like for you to have Mr. Kerns come with you,' and she requested me to communicate with Mr. Kerns and have him come out to the house and act as a witness.

"Q. Was any one present except you and Mrs. Solari during the conversation in which she told you how to draw her will? A. There was not, no, sir.

"Q. Did you then draw a will? A. I returned to the office, and the next day I drew the will, and then a day or two later I phoned the residence and found out when it would be satisfactory for me to come out there and was told when to come, and then I notified Mr. Kerns to meet me out at the house to have the will executed.

"Q. Did you inform Mr. Kerns as to the purpose of the visit? A. I did.

"Q. Told him that Mrs. Solari had requested him to come? A. I advised Mr. Kerns that Mrs. Solari advised me that she desired to have him as a witness to her will.

"Q. Did you go there at the appointed time? A. Yes, sir, we went. It was very convenient for me to go by the house after leaving the office and just before going home, so late this afternoon, May 29th, I think the date is, 1939, I arranged with Mr. Kerns to meet me out there and I went out. I got there first, arrived before Mr. Kerns did. I had the will with me, and I was admitted into the house and again saw Mrs. Solari by herself; no one else was present. My recollection is that we went into the dining room, or breakfast room, where there was a table. I am rather inclined to believe it was the breakfast room, and before Mr. Kerns came I read the will over to Mrs. Solari and asked her if that is what she wants as a will. She thoroughly understood it and said that she wanted to execute it, and after I had finished reading about five or ten minutes Mr. Kerns came in.

"Q. Well, then did she declare this to be her will and sign it? A. Now, when Mr. Kerns came back in the room, he was admitted by one of the young ladies is my recollection and then came into the room where we were, Mrs. Solari and I were, and he spoke to Mrs. Solari first and had one or two words to say to her, and then I said to Mrs. Solari, I said 'Now, Mrs. Solari' in Mr. Kerns' presence 'Did you hear me read that will? She said 'Yes, sir.' I said 'Do you want to sign that paper as your will?' and she said 'I do,' and I said 'Do you want Mr. Kerns and myself to witness it as your will?' and she said 'Yes, sir,' and then she signed the will in the presence of Mr. Kerns and myself, and then Mr. Kerns and I signed it as witnesses.

"Q. Is this the will (handing paper to witness)? A. Yes, sir, that is the will, Mr. Exby.

"Q. That bears her signature? A. That bears her signature and the signature of Mr. Kerns and myself as attesting witnesses.

"Q. Now, that bears date of May 29, 1939? A. That is the date.

"Q. Now then, after that will was executed, what was done with it? A. I had taken an envelope out with me and after the will was executed I asked Mrs. Solari what she wanted to do with it, and she said she wanted to put it in her box. I said all right, we will put this will in the envelope, and I sealed the enevelope in her presence and gave it to Mrs Solari.

"Q. Gave it to Mrs. Solari. Was Mrs. Solari of sound mind at that time? A. Unquestionably so."

Mr. Frank L. Kerns, the other subscribing witness to the will, testified that he was a member of the real estate firm of Hobson-Kerns; that he knew Mrs. Solari for a number of years as real estate agent for her property and came regularly in contact with her for that reason; that she was of sound mind at the time of the execution of the will, that she had a sight impediment in her speech, but that she still had her pleasent cheerful manner and that this impediment in her speech was the only difference he could see.

The deposition of Gary Albertine, grandson of Mrs. Solari, was taken. He testified that he was an ensign in the U. S. N. R.; that from his childhood he had been closely associated with his grandmother and saw her daily up to the time he entered the service; that his grandmother spoke fluently before she had the stroke, but after that there was an impediment in her speech;

that there was no change in her mental condition after the stroke; that she maintained her mental faculties as long as she lived and gave his opinion that his grandmother was sane at the time of the execution of the will.

Likewise the deposition of Alex Gary, another grandson of Mrs. Solari, was taken. He testified that he was in the Air Corps of the Armed Services; that his association with his grandmother had been very close; that he spent as much time in her home as he did in his own; that there was no change in his grandmother's mental condition after the stroke; that her mental condition was perfectly normal at the time of the execution of the will.

The witness, B. B. Chiles, testified that he conducted a grocery store about a block from Mrs. Solari's home and known her as a customer for twelve or fifteen years; that she came to his store to buy groceries practically every day during that time; that her illness, caused by the stroke, she came back to the store just as she had done before; that she was careful as to the price of articles, declining to purchase if too high; that she paid for groceries as they were purchased; that he cashed checks for her, all of which she signed. His opinion was that she was sane and that he hoped to "be as sane as she is when I get her age when she died."

There are other facts in the record tending to show the mental competency of Mrs. Solari, but we think enough has been stated to show that the verdict of the jury and the judgment of the Circuit Court were based on material evidence in support of the same.

In the brief of contestant, it is stated that while there are several errors in the record, the contestant relies upon the assignment that there is no evidence to support

the verdict and the failure of the Court, to give in charge to the jury the contestant's special request as follows:

· "The Court futher instructs you that if you find from a preponderance of the evidence that a close and confidential relationship existed between the testatrix, Mrs. Mary Solari, and her granddaughter, Mary Albertine, then the existence of such a close and confidential relationship between testatrix and legatee or devisee gives particular opportunity for unduly influencing the mind of the testatrix, and creates a suspicion that such an influence may have been exerted; and when a will is executed through the intervention of a person occupying a confidential or influential position to her advantage, then the law casts upon her the burden of removing this suspicion by showing that the will was the free and voluntary act of the testatrix, Mrs. Mary Solari. . . .

In support of the last assignment of error the contestant calls our attention to the case of Bridges v. Agee, 15 Tenn. App. 351, Opinion by Judge DeWitt. The facts in that case were that Mrs. Agee, a widow, without children, was afflicted with a disease of the spinal·column, rendering her undable to walk; that her regular physician was Dr. J. G. Bridges; that this disease was incurable and progressive and brought about her death on September 14, 1931; that the alleged will was executed on August 12, 1931; that the will in question was drafted by Dr. Bridges. After two minor bequests the will bequeathed to Dr. Bridges all the residue of her estate, real and personal, and appointed Dr. Bridges as executor of the will.

Under these facts the Cricuit Judge charged the jury the law to be substantially as stated in the request which is made the basis of this assignment of error. The Court of Appeals held that under the facts of that case the in-

struction was properly given, and cites Pritchard on Wills in support.

In that mentioned work at Sec. 133 it is said that the existence of a confidential relation between the testator and a legatee or devisee, such as guardian and ward, attorney and client, physician and patient or spiritual adviser and layman gives peculiar opportunity for unduly influencing the mind of the testator and creates a presumption that such influence may have been exercised, and in such case the casts upon him the burden of showing that the will was the free and voluntary act of the testator.

However, we think the authorities are uniform to the effect that merely confidential relations as shown in the instant case to exist between Mary Albertine and her grandmother does not raise the presumption that the beneficiary has exercised undue influence over the testator and cast upon her the burden of disproving undue influence.

The only proof in the record tending to show such undue influence is the cirumstance of their relationship as grandmother and granddaughter and that they lived together.

There is no proof that Mary Albertine had anything to do with the prepartion or execution of the will and in the absence of such proof the burden of disproving undue influence is not upon her.

In the brief of the proponent we are cited to rule as stated in 154 A. L. R. p. 583, in which the annotator says:

"The later cases support the general rule stated in the earlier annotation on this subject, that the mere existence of confidential or fiduciary relations between a testator and a beneficiary under his will does not give rise to a presumption that the beneficiary exerted undue influence on the testator, in the absence of some activity on the

part of the beneficiary in connection with the preparation of or execution of the will.''

And so in the instant case the mere opportunity afforded by the relations between Mary Albertine and the testator raises no presumption of the exercise of undue influence in the absence of a showing that she had some active part in the preparation or excution of the will. There is no such showing. The showing is that Mary telephoned Mr. Randolph, at the direction of her grandmother, that she wanted to see him. Mr. Randolph's testimony is that Mary telephoned him, but that she was not present at the preparation or execution of the will.

If the evidence in the instant case tended to show that Mary Albertine induced her grandmother to make the will in her favor such fact alone would not invalidate the will. In order to invalidate the will such inducement must be accompanied by fraud or deceit and of such a nature as to substitute her will for that of the testator as said in Pritchard on wills, Secs. 13, 131:

''Honest Intercession, Argument and Persuasion. A person has a right by fair argument or persuasion to induce another to make a will, and even to make it in his own favor. Appeals to affection, attachment and sense of duty and obligation, accompanied by honest intercession and persuasion, will not, in the absence of fraud or deceit, vitiate the execution of a will where the testator is of competent, sound mind. But there may be great and overruling importunity and undue influence in the absence of fraud (which, when exercised upon a person of weak mind, or an old and feeble man, or a testator upon his death-bed, when even a word distracts him, may amount to moral force and avoid a will.

''Accordingly, it has been held that the will of a testator of unquestioned capacity cannot be destroyed by proof

that the beneficiary subjected him to persistent and irritating importunities, it appearing that the will was drawn up from the testator's dictation, in the absence of the beneficiary and executed by him in the presence only of the scrivener and the witnesses selected by the testator.

"Influence gained by Kindness and Affection.—Influence acquired over a tesator by kind offices, affection and attention, even if accompanied with persuasion, unconnected with fraud or contrivance, is not such undue influence as will invalidate a will, even though it induce the testator to make an unequal distribution of his property in favor of those who have contributed to his comfort and administered to his wants; unless, indeed, the influence be of an irresistible character; considering the mental and physical condition of the testator, and is exerted over the very act of devising, so as to prevent the will from being the act of the testator. On the contrary it is natural and proper upon those who are around him and who have attended upon and cared for him, to the exclusion of those at a distance, and the fact that he does so, furnishes a presumption in favor of the will, rather than against it."

We have examined the charge given to the jury by the Circuit Judge and find the same to be fair, full and explicit on the issues in the case. We think the ends of justice have been met by the verdict of the jury, approved by the Trial Judge.

The assignments of error are overruled and the judgment of the Circuit Court is affirmed.

The contestant, Anthony J. Solari, and his surety will pay the costs.

Anderson, P. J., and Ketchum, J., concur.