**Mary Teresa BASHAM, et al.**

v.

**Diane Ray DUFFER, et al.**

Court of Appeals of Tennessee, at Nashville.

Assigned on Briefs March 9, 2007.

June 27, 2007.

Grayson Smith Cannon, Goodlettsville, Tennessee, for the appellants, Mary Teresa Basham and William Bennett Collins, Jr.

Robert Michael Crawford, Springfield, Tennessee; Donald Arkovitz, Destin, Florida, for the appellees, Diane Ray Duffer, James F. Ray, and Martin Ray.

## OPINION

WILLIAM B. CAIN, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL and FRANK G. CLEMENT, JR., JJ., joined.

Appellants served as the deceased's attorneys-in-fact, and brought suit against the three parties who previously cared for the deceased. The deceased was an elderly widow with little experience in handling her own money. Appellants alleged that Appellees mishandled the deceased's funds for their own personal benefit. The trial court found no breach of duty on the part of Appellees, declaring the deceased to have been competent at the time of the dissipation of her funds, and therefore dis-

missed the case. We affirm in part and reverse in part.

## I. FACTUAL BACKGROUND

Estelle Ray ("Ray") was married to Fred Ray ("Fred") when he died in January of 2000. The two had no children together. Fred had three children from a previous marriage, the Appellees in this case: Diane Ray Duffer ("Diane"), James F. Ray ("James"), and Martin Ray ("Martin") (collectively, "Appellees"). Ray had one child from a previous marriage: William Collins, Sr. Appellants in this case are Mary Teresa Basham ("Basham"), Ray's niece, and William Bennett Collins, Jr. ("Collins"), Ray's grandson from her first marriage (collectively, "Appellants"), parties as Ray's attorneys-in-fact.

During their marriage, Ray was completely dependent upon her husband, as she had a sixth grade education, left the banking and business affairs to Fred, and never learned to drive. By all accounts, the Rays lived very frugally and gave only inexpensive gifts. Testimony at trial established that following her husband's death, Ray seemed very depressed, but remained mentally competent until she suffered a stroke in 2002. At the time of Fred's death, Appellants assert that he and Ray held approximately $200,000 in joint bank accounts.

Shortly after Fred's death, his son Martin began assisting Ray with her business affairs. The testimony at trial established that Martin was never appointed Ray's power of attorney, but that Fred, Ray, and Martin had all agreed that Martin would assist Ray following Fred's death. Appellants allege that between January and July of 2000, Martin withdrew a significant amount of money from Ray's bank accounts. Appellants assert that Ray never gave Martin permission to utilize her funds for any purpose other than the payment of her bills. In July of 2000, Ray appointed her other two step-children, Diane and James, her attorneys-in-fact. James moved in with Ray, assisting her with household chores and transportation. Although Basham claims to have encouraged them to, Diane and James made no attempts to recover any of the funds that Martin used without authorization.

During the time that Diane and James retained Ray's power of attorney, Ray sold her house to a neighbor. Ray retained a life estate in the house, and the proceeds from the sale were approximately $84,000. Appellants allege that Diane and James subsequently drained the account into which the proceeds from the sale were deposited. Further, Ray had in her possession a Ford vehicle. The certified title history of the Ford indicated that the Ford was purchased by Fred. After his death, it was transferred by Ray to Martin as a gift. The Ford was then sold by Martin back to Ray for $2,500. Finally, the Ford was transferred to Tammy Swift, Diane's daughter, for no consideration. Also missing from Ray's personal property were tools and yard equipment, such as shovels and a riding lawnmower. During the trial, Diane testified that the lawnmower had been taken to her son-in-law's house.

Appellants allege that Basham received a telephone call from Ray, asking that she be taken to the bank where her accounts were held. Basham testified that following the meeting with bank officials, Ray became very upset. On May 3, 2002, Ray executed a power of attorney appointing Appellants Basham and Collins as her attorneys-in-fact. Appellants allege that upon obtaining Ray's power of attorney, Ray had a total of only $10,000 remaining in her bank accounts. After obtaining Ray's bank records, Appellants assert that while it did appear that Ray signed some of the checks dispersing funds, not all of

the writing on the checks appeared to be that of Ray. The checks that were entered as exhibits at trial show an "X" preceding Ray's signature, and according to Appellants this indicates that Ray was directed by another party to sign her name to the checks. Further, Appellants allege that several of the payees on the checks were family members of Diane and James. For instance, checks were made out to Crystal Ray (James' daughter), Ginger Pate (James' daughter), and Glenn Duffer (Diane's husband). There were also checks made out to Diane and James personally. However, it should be noted that both Appellant Collins and Ray's son received sums of money as well. Additionally, there were several ATM transactions that Appellants believe Ray to have been incapable of performing, as they allege she never possessed an ATM card on any of her accounts.

On June 18, 2002, Ray filed a Complaint through Appellants as her attorneys-in-fact, demanding that Appellees account for "any and all funds of [Ray and her husband] which they handled, transacted, deposited, withdraw [sic] or otherwise managed" and the recovery of damages "for any and all funds which [Appellees] have wrongfully acquired either by fraud, conversion or any other act of misappropriation...." In November of 2002, Ray had a stroke and Basham cared for her until her death the following year. By all accounts, Ray remained mentally alert until the time of her stroke. Ray died on December 30, 2003, during the pendency of the trial court proceedings. In all, Appellants allege that Ray dispensed a total of $188,227.56 to the benefit of Appellees. When Appellants took over as Ray's attorneys-in-fact, they estimated that she retained approximately $10,000. Appellees counter that Ray was mentally competent prior to her stroke, that she desired to distribute her money to her family, and

that she voluntarily signed each and every one of the checks in question, making such transactions valid.

The trial took place without a jury on September 16, 2004. The trial court entered its order on October 6, 2004, finding specifically that "the lawsuit charging that Martin Ray, Diane Ray Duffer, and James F. Ray breached a fiduciary relationship with Estelle Ray is dismissed." The Judgment made very clear the fact that the trial court was not comfortable with its ruling, but saw no feasible alternative:

And as far as the money, it's really hard to believe what happened to the money. It's really hard to believe. From the time Diane Ray Duffer and James Ray took a position of trust with Mrs. Estelle Ray holding her power of attorney . . .

. . . .

. . . [F]rom July of 2000 to May 2002, 22 months, and in that 22 months Diane Ray Duffer and James Ray did withdraw through various means 135—more than $135,000 in a 22–month period, more than $135,000. It's really hard to believe.

Diane Ray Duffer received some $36,000. All of those transactions by which Diane Ray Duffer received for herself $36,000—and you can tell it's for herself by the sums, $2,500; $2,000; $8,000; $4,200; $9,500; $5,000; $4,800, and she never made any other explanation anyway—$36,000. For every one of those transactions, Estelle Ray signed.

There's no evidence—and here again the Court has really scrutinized the signature on those documents to try to determine whether they favorably compare with the known signature of Estelle Ray and they do. If they're not the signature of Estelle Ray, the Court doesn't know the difference, and I am

not an expert although I am entitled under the law to render this decision. $36,000 to Diane Ray Duffer was signed for by Estelle Ray, and I don't know how you accept from a widow who has nothing. Her right to the home has been sold. The farm equipment has been sold. The car has been sold. The tools have been given away. I don't know how you take from a widow gifts of $36,000, but they were signed for by Estelle Ray, remember the mentally competent person who wasn't prone to giving big gifts while she was married to Fred Ray.

. . . .

In these 22 months that those two individuals were in charge, that is Diane Ray Duffer and James Ray, Mr. James Ray received $48,109.65. The same woman that gifted Diane Duffer, who held her power of attorney, gifted James, who held her power of attorney, gifted James $48,109.65. And this is from a widow who no longer had anything to her name, her interest in the farm, or any of the equipment, and not even a vehicle. But all of the transactions for that $48,109.65 were signed by Estelle Ray who could read and write. That's what the evidence establishes.

. . . .

You know, this is a court of law. Responsibility for what people do stops there. All the court of law can do is decide not whether something was really right but legal. Mrs. Ray signed all of that, signed for all of those, quote, gifts . . . .

. . . .

But she was clearly gifting people and there were two people right there with her day-in and day-out who never said, "No, I can't take this. It's all you've got in the world. We can't do that." And I don't know otherwise. I don't know oth-erwise but that Mrs. Ray intended for them to have all that she owned. I really don't know otherwise. She was mentally competent until she had her stroke in November 2002. By that time Diane Ray Duffer was no longer in control of her financial affairs and neither was James Ray. And it's not for the court to second guess whether Mrs. Estelle Ray should have signed any of those transactions as gifts to any of these individuals, but she did. And that's the finding of the Court.

The trial court also addressed the Ford automobile, stating:

Mrs. Ray could read. This document says, "The undersigned duly sworn, owner of the vehicle alleges there is no debts or liens on the vehicle, vests ownership in the vehicle in Martin Ray, son." She is identified on this document as the surviving heir of Fred Ray, and that car was titled in Martin Ray's name with Estelle Ray knowing and having had to participate in that transaction by the signing of those documents.

We are a title state. The title owner has to participate, and Mrs. Ray's signature evidences her participation, and the Court finds from the examination of those records that what Mr. Martin Ray testified to has to be true. It just has to be true. She was mentally competent; everyone agrees. She could read and write.

The Court looked at those signatures and compared it to signatures on other documents known to have been her signature and thinks that it favorably compares and there is no evidence otherwise. Mr. Martin Ray also told us that in none of these transactions that he had made in Estelle's behalf was any coercion used . . . .

Appellants appeal three issues: (1) whether the trial court erred in failing to

find that certain presumptions regarding undue influence arose in this matter, thereby shifting the burden of proof to Appellee Martin, (2) whether the trial court erred in failing to find that Appellees Diane and James breached a fiduciary duty to Ray; and (3) whether Appellants are entitled to prejudgment interest.

## II. STANDARD OF REVIEW

■■■ Review of the trial court must be in conformance with Tenn. R.App. P. 13(d), which states that "review of findings of fact by the trial court in civil actions shall be de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise...." Tenn. R.App. P. 13(d). As stated by this Court:

> The trial court's findings of fact are reviewed *de novo* with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R.App. P. 13(d). "Our search for the preponderance of the evidence is tempered by the principle that the trial court is in the best position to assess the credibility of the witnesses; accordingly, such credibility determinations are entitled to great weight on appeal." *Rice v. Rice,* 983 S.W.2d 680, 682 (Tenn.Ct.App.1999) (citing *Massengale v. Massengale,* 915 S.W.2d 818, 819 (Tenn.Ct.App.1995); *Bowman v. Bowman,* 836 S.W.2d 563, 567 (Tenn.Ct.App.1991)). Questions of law are not entitled to Tenn. R.App. P. 13(d)'s presumption of correctness on appeal. We will review the legal issues *de novo* and reach our own independent conclusions regarding them. *Southern Constructors, Inc. v. Loudon County Bd. of Educ.,* 58 S.W.3d 706, 710 (Tenn. 2001); *King v. Pope,* 91 S.W.3d 314, 318 (Tenn.2002).

*Cantrell v. Cantrell,* No. M2003–00551–COA–R3–CV, 2005 WL 711966, at *2 (Tenn.Ct.App. Mar.28, 2005).

## III. ANALYSIS

### A. Martin Ray

Regarding Appellee Martin, Appellants allege that a confidential relationship arose between Ray and Martin. In attempting to establish such a confidential relationship, Appellants focus on Ray's level of dependence upon Martin rather than her level of overall competence. Therefore, Appellants maintain that in light of the confidential relationship, a presumption arose which shifted the burden of proof to Martin to show the fairness of the transactions regarding Ray's funds. According to Appellants, Martin failed to meet such burden at trial.

■■■ As noted by this Court in 1973, "[p]roof of the existence of the normal family relationship between a parent and adult child, standing alone, does not give rise to an inference or presumption that either one exercises any dominion and control over the other." *Iacometti v. Frassinelli,* 494 S.W.2d 496, 499 (Tenn.Ct.App. 1973). In another case, the Supreme Court of Tennessee made sure to distinguish between influence and undue influence:

> First we recognize it to be the law in this jurisdiction that it is not *influence* that invalidates a conveyance or will, but *undue influence;* that "[a] person has a right by fair argument or persuasion to induce another to make a will [sign a deed], and even to make it in his own favor," provided the influence is "exerted in a fair and reasonable manner, and without fraud or deception." *Phillips' Pritchard on Wills,* Sections 130, 131; *Halle v. Summerfield,* 199 Tenn. 445, 287 S.W.2d 57 (1956). In *Halle,* the Court cited with apparent approval the

case of *Solari v. Albertine,* 29 Tenn.App. 61, 193 S.W.2d 111 (1945), and with respect thereto noted:

It was there held that mere proof of a confidential relationship "does not raise the presumption that the beneficiary has exercised undue influence over the testator and cast upon her the burden of disproving undue influence; that is in the absence of a showing of some activity on the part of the beneficiary in connection with the preparation or execution of the will." 199 Tenn. at 445, 287 S.W.2d at 61.

. . . .

Again, in *Halle,* the Court quoted from A.L.R. with approval:

It is settled that the mere fact that one who benefits by a will had a motive and an opportunity to exert influence over the testator is not sufficient, *of itself, to create a presumption that the will was the product of undue influence.* 199 Tenn. at 456, 287 S.W.2d at 62.

. . . .

In line with these authorities we hold that the normal relationship between a mentally competent parent and an adult child is not *per se* a confidential relationship and raises no presumption of the invalidity of a gift from one to the other. In order for such a presumption to arise there must be a showing that there were present the elements of dominion and control by the stronger over the weaker, or there must be a showing of senility or physical and mental deterioration of the donor or that fraud or duress was involved, or other conditions which would tend to establish that the free agency of the donor was destroyed and the will of the donee was substituted therefor. In such cases the rules require the application of the presumption and the rule of independent advice comes into play.

*Kelly v. Allen,* 558 S.W.2d 845, 847–48 (Tenn.1977). The Court went on to note that the holding was restricted to parent-child relationships. Finally, this Court noted that "the existence of a confidential relationship between members of a family . . . does not raise the presumption that the beneficiary has exercised undue influence over the testator and cast upon her the burden of disproving undue influence." *Vantrease v. Carl,* 56 Tenn.App. 636, 642, 410 S.W.2d 629 (Tenn.Ct.App.1966).

■ The trial court, after hearing the testimony of all the parties to the suit (with the exception of the deceased), determined that "there was no evidence that . . . [Ray] was subject to any undue influence or coercion. . . ." Ray signed the checks disbursing her funds, and all parties testified to her competence at the time of such disbursements. No evidence of coercion, fraud, or deception was presented, leading to the conclusion that the transactions were fair. This Court, after reviewing the record on appeal, has no choice but to agree with the trial court's assessment of the evidence. The record fails to establish the existence of any confidential relationship between Ray and Martin that would result in a presumption of undue influence. The trial court's holding as to Appellee Martin is affirmed.

**B. James F. Ray and Diane Ray Duffer**

Appellants allege that the existence of a power of attorney bestowed upon Diane and James by Ray in itself establishes a confidential relationship. Further, Appellants allege, Diane and James actively sought such legal status, thereby providing additional evidence of a confidential relationship. As Ray's fiduciaries, Diane and James were to act in Ray's best interests. Appellants argue that Diane and James should have pursued legal action in regard to Martin's conduct involving Ray's bank

accounts, and that their failure to attempt recovery of the funds constituted a breach of their fiduciary duty as Ray's attorneys-in-fact. Appellants further argue that, as Ray's fiduciaries, Diane and James wrongfully drained Ray's bank accounts for their own personal benefit.

■ James and Diane possessed an unrestricted power of attorney, the significance of which has been addressed by this Court as follows:

> The existence of a confidential relationship, such as an unrestricted power of attorney, combined with a transaction benefiting the dominant party, creates a presumption of undue influence. *See Matlock v. Simpson,* 902 S.W.2d at 386; *Johnson v. Craycraft,* 914 S.W.2d 506, 510 (Tenn.Ct.App.1995); *Petty v. Privette,* 818 S.W.2d 743, 747 (Tenn.Ct.App. 1989). The presumption of undue influence is rebuttable by clear and convincing evidence of the fairness of the transaction. *See Matlock v. Simpson,* 902 S.W.2d at 386; *Hager v. Fitzgerald,* 934 S.W.2d 668, 671(Tenn.Ct.App.1996); *Bills v. Lindsay,* 909 S.W.2d 434, 440–41 (Tenn.Ct.App.1993).

*Fell v. Rambo,* 36 S.W.3d 837, 847–48 (Tenn.Ct.App.2000). As for the types of relationships applicable to such law:

> [W]e are mindful that "the presumption of undue influence extends to all dealings between persons in fiduciary and confidential relations, and embraces gifts, contracts, sales, releases, mortgages and other transactions by which the dominant party obtains a benefit from the other party." *Gordon v. Thornton,* 584 S.W.2d 655, 658 (Tenn.Ct.App.1979) (citing *Williams v. Jones,* 54 Tenn.App. 189, 388 S.W.2d 665 (1963); *Roberts v. Chase,* 25 Tenn.App. 636, 166 S.W.2d 641 (1942)).

*Parish v. Kemp,* 179 S.W.3d 524, 531 (Tenn.Ct.App.2005). Therefore, a pre-sumption of undue influence arose if James and Diane, possessors of an unrestricted power of attorney, both executed such power and benefited from transactions involving Ray's funds. Clear and convincing evidence of the fairness of the transaction will rebut such presumption.

■ James most certainly exercised his power of attorney status, as was established several times at trial. For instance, James signed numerous withdrawal slips on Ray's bank accounts, usually signing his name and then writing "P.O.A. for Estelle Ray" below his own signature. The withdrawals were for significant amounts of money, specifically: $9,000.00; $11,109.65; $950.00; $9,000.00; and $615.88. James utilized his power of attorney status to withdraw a total of $30,675.53 from Ray's accounts. Also, James signed the Motor Vehicle Transfer when the Ford was given to Tammy Swift, again noting on the document that he was Ray's attorney-in-fact. Further, James benefited from the transactions involving Ray's funds, as several checks were made out to him and members of his immediate family.

■ Whether Diane actually exercised her power of attorney status is a more difficult question. It does not appear from the record that Diane acted upon her power of attorney status as clearly as James did. Refraining from exercising such power proved to work in Diane's favor, as this Court has stated:

> "Under Tennessee law, as in most jurisdictions, a presumption of undue influence arises where the dominant party in a confidential relationship receives a benefit from the other party." *In re Estate of Hamilton,* 67 S.W.3d 786, 793 (Tenn.Ct.App.2001) (citing *Matlock v. Simpson,* 902 S.W.2d 384, 386 (Tenn. 1995); *Crain v. Brown,* 823 S.W.2d 187, 194 (Tenn.Ct.App.1991)). "[A] confiden-

tial relationship arises as a matter of law when an unrestricted power of attorney is granted to the dominant party." *Childress,* 74 S.W.3d at 328–29 (citing *Matlock,* 902 S.W.2d at 386); *see also In re Estate of Hamilton,* 67 S.W.3d at 793; *Mitchell,* 779 S.W.2d at 389 ("A person authorized to act on behalf of another by virtue of an unrestricted power of attorney has a confidential relationship with the person who executed the power of attorney."). **No confidential relationship arises when an unrestricted power of attorney is executed but has not yet been exercised.** *Childress,* 74 S.W.3d at 329....

*Parish,* 179 S.W.3d at 531 (emphasis added). Therefore, Diane's failure to execute any transactions as power of attorney results in the absence of the confidential relationship presumption, and thereby releases her from liability as to this matter.

 James exercised his status as Ray's power of attorney, placing the burden on him to prove by clear and convincing evidence that any of the transactions were fair to Ray. The trial court failed to recognize this shift in the burden of proof during trial. Also, James gave no explanation of the fairness of the transactions. He simply testified that the money was given away by Ray and/or used to pay bills, without elaborating further. Therefore, James failed to satisfy his burden of proof at trial, and the trial court's judgment as it pertains to James is reversed.

Disturbing to this Court, as it was indeed to the trial court, are the surface implications involving an elderly lady and her money. Impeding, however, at both the trial court level and the level of appellate review is the almost total absence of competent evidence of anything. Testimony of the deceased, in no form, was procured prior to her death during the pendency of the trial. Her mental competency was

never questioned. Only nebulous assertions of undue influence without any substantial proof appear from the record. As pertains to Martin and Diane, we are simply in no position to second guess the credibility determinations made by the trial court concerning allegations finding little support in the testimonial record. *Mitchell v. Archibald,* 971 S.W.2d 25 (Tenn.Ct.App.1998).

The judgment of the trial court is affirmed in part and reversed in part, and the cause is remanded to the trial court for determination of damages. Costs of the cause are assessed equally to Appellants and Appellee James F. Ray.