DAVID S. GRAVES, Ex'r. *v.* ROBERT S. WHITE, *et als.*

CONTRACT. *Confidential Relations. Undue influence.* Where parties to a contract occupy confidential relations to each other, the fact that one of the contracting parties was in a state of mental and physical weakness, and in his second childhood at the time, makes it proper for a Court of Equity to view such contract with the strictest scrutiny, and before it be allowed to stand, require the clearest and most satisfactory evidence to be adduced that at the time of the transaction no advantage whatever was taken, either of the confidential relations existing in order to obtain a benefit, or of the weakness and frailty of the party from whom the benefit was received.

Authorities cited: 2d Leading Cases in Eq., 536 and Notes; Bisph. Pr. Eq., 229.

---

FROM DAVIDSON.

---

Appeal from the Chancery Court.    E. H. EAST, Chancellor.

W. F. & H. COOPER for complainants.

JOHN REID and F. D. MOORE for defendants.

FREEMAN, J., delivered the opinion of the Court.

This case, as presented by the appeal of White and wife, involves the question of the validity of what is assumed to have been a gift of $10,000, to Rosalie White, his niece. Other questions were in the case in the Court below, but the one we have stated is alone presented for our decision at present; the decree

of the Chancellor being acquiesced in by all parties as to all other matters involved. .

The $10,000 in controversy is claimed by White and wife, as given by a check on White & Cochran, a firm doing business in the city of Louisville, Kentucky. It is as follows:

*Louisville, January* 15, 1868.

WHITE & COCHRAN. Pay to Rosalie White, or order, to build up storehouse, Ten Thousand Dollars.

(Signed)         THOS. WELLS.

A brief summary of the facts raising the question for decision is as follows: Thomas Wells had been in business as druggist for a great number of years in the city of Nashville. In this business, carried on in a house on Market street, a very considerable fortune had been accumulated. He had no family, lived in perhaps the upper story of his business house. His sisters and their children very naturally expected, no doubt, to receive his property on his death. Rosalie White, a niece, had been educated and cared for by him, and seemed to be the special object of his affection, and as far as we can see deservedly so.

In the latter part of 1865, the old man, then probably between seventy and eighty years of age, had an attack of sickness, giving a severe shock to his physical, as well as his mental powers. White had some years before intermarried with Rosalie, the niece, and was living in Louisville, Kentucky, engaged in a wholesale mercantile business, as senior member of the firm of

White & Cochran, doing probably a profitable business. On the recovery of Wells, White visited him in Nashville, and Wells being as we think, unfitted for the conduct of his business, consented to sell out his stock, rent out his house, and remove to Louisville, making White's house his home. The proof shows pretty clearly, that Dr. Wells probably fixed the price of his stock of drugs at $25,000, yet White conducted the negotiations, and ultimately succeeded in selling them at perhaps about $22,000, a full price.

From this time Dr. Wells lived in White's family, White managing his affairs, investing his money, and evidently having his confidence, as well as management of his business in the main, if not entirely, while his money was deposited in the house of which White was senior member.

While the proof on the first aspect of it might appear somewhat contradictory as to the mental powers of Dr. Wells from the time of his removal to Louisville, yet, on closer view of it, we do not think there is much if any real conflict on the subject. Its results may be summed up about as follows: Those witnesses almost without exceptions who casually met and conversed with him, think as far as they observed, that his mind was about as sound as most feeble old men of his age—all agreeing, however, that he was very feeble in body. On the other hand, those who had the best opportunities of knowing Dr. Wells, who had been most familiar with him, among them old friends who had served their apprenticeship with him, as druggists,

give their opinion that his mind was greatly impaired, and give facts on which their opinions were based. This view is much strengthened by the cautiously expressed views of the physician in Louisville, Dr. Hewitt, who had been called to see him professionally several times during his residence there, and who attended him in his last sickness. It is further shown, as a fact, that he had his meals carried to him in his own room generally, and from the statements of White himself, had to be nursed and cared for like a child—a servant having been hired and kept especially for this purpose. It is further shown by like proof, coming from White, that he deemed him incompetent to have made a codicil or addition to his will, after he had left Nashville, and gone to Louisville. In a word, the proof shows Dr. Wells to have been in a state of great feebleness, both of mind and body, in his second childhood, if it does not make out a case of total incompetency to have performed any valid act involving an intelligent assent to terms or stipulations.

Under these circumstances, upon long settled principles regulating contracts between parties occupying confidential relations to each other, if such a gift, as is here contended for, would not be held absolutely void for want of mental capacity, a Court of Equity would view such a transaction with the strictest scrutiny, and before it could be allowed to stand, require the clearest and most satisfactory evidence to be adduced, that at the time the transaction took place, no advantage whatever was taken, either of the confiden-

tial relations existing in order to obtain a benefit, or of the weakness and frailty of the party from whom the benefit was received. See *Haguerin* v. *Bosley,* 2d L. Cases In. Eq., 536, and notes. Bisph. Pr. Eq., 229.

. We find no such proof of the attending circumstances in this case. We have only the check, of date January 15th, 1868. The proof shows, however, that it was not presented or charged on the books to his account till in December following, only a few days before his death, probably after his sickness had manifested itself, or at any rate increased feebleness had given monition of his approaching end.

Under these circumstances, we think the Chancellor decreed correctly in refusing to allow this gift to stand and holding it invalid. Let the decree be affirmed with costs of this Court. Costs of Court below as decreed by the Chancellor, and as he may decree on final hearing.

The case will be remanded for taking proper accounts, and further proceedings.