## ORVILLE H. WILLIAMS, JR. and THELMA CAROLYN JONES WILLIAMS, Appellees, v. BILBO CLYDE JONES, Appellant.—388 S. W. (2d) 665.

Western Section. April 17, 1963.

Certiorari Denied by Supreme Court December 5, 1963.

190

Evans, Petree & Cobb, Memphis for appellant.

Bill R. Davis, Wrape & Hernly, Memphis, for appellees.

CARNEY, J. The complainants below, Orville H. Williams, Jr. and wife, Thelma Carolyn Jones Williams, filed their bill in Chancery Court seeking to set aside three written instruments: namely, a quitclaim deed, a release and an agreement which they had executed on or about July 23, 1958, in favor of the defendant, Bilbo

Clyde Jones, an uncle of the complainant, Thelma Carolyn Jones Williams. The complainants also sought to set up a constructive trust and establish title to an undivided one-half interest in a very valuable tract of land composed of approximately fifteen acres located about one mile west of Germantown just north of U. S. Highway 57 (Poplar Pike) in Shelby County, Tennessee. The original bill alleged fraud, undue influence and breach of confidential relationship between the defendant, Bilbo Clyde Jones, and his niece, the complainant Thelma Carolyn Jones Williams.

Complainants demanded a jury; later by written consent the jury was waived; the court upon his own motion empaneled a jury and submitted the following issue of fact: ''Did the defendant, Bilbo Clyde Jones, on or about July 23, 1958, obtain by fraud, or undue influence, from the complainants Orville H. Williams, Jr. and Thelma Carolyn Jones Williams, a quitclaim deed, a receipt and release and an agreement?'' The jury answered this issue, ''No.''

Upon a motion by the complainants the Chancellor disregarded the verdict of the jury and rendered a decree in favor of the complainants upon a finding by him that the defendant stood in a confidential relationship toward the complainant niece and her husband and that the complainants had not had the benefit of independent advice relative to the transactions in question.

By appropriate decree His Honor the Chancellor set aside the quitclaim deed, the release and the agreement and further declared the complainant, Thelma Carolyn Jones Williams, to be vested with an undivided one-half interest and tenant in common with the defendant, Bilbo

Clyde Jones, in said fifteen acre tract of land. He then referred the cause to the Clerk & Master to take and state an account between the parties for an adjustment of the debits and credits existing between the parties.

Defendant prayed for and was granted a discretionary appeal. He has filed twelve assignments of error in this court.

Solicitors for the appellees have filed a "Reply Brief and 22 Assignments of error" containing 90 pages. The 22 assignments of error complain of the action of the Chancellor in failing to find the defendant, Bilbo C. Jones, guilty of fraud in the procurement of the three written instruments and in failing to assess punitive damages against the defendant.

A brief history of the title of the land and the events leading up to the filing of the present litigation is to be found in the succeeding statement of His Honor the Chancellor from which we copy as follows:

"The undisputed facts reveal that for some years prior to 1941, the land in question had been leased by T. W. Jones from Robert C. Lyons. Robert C. Lyons died and his interest in the land descended to his two sons, Robert Lyons and James Lyons. Believing that Robert was the sole owner of the land, T. W. Jones entered into correspondence with Robert, then a resident of South Carolina, to purchase for the benefit of his two sons, Bilbo C. Jones and Joseph Cullen Jones, this land. On January 13, 1941, Robert C. Jones contracted to sell the land to B. C. Jones and J. C. Jones for $750.00 cash and accepted $10.00 as earnest money. (Exhibit 4, herein). It then developed that James Lyons had an interest in the land, and on February 7,

1941, he agreed to sell his and his brother's interest in the land to the Jones brothers for $850.00 and received as earnest money $15.00. On February 18, 1941, Robert C. Lyons and James C. Lyons conveyed the land by warranty deed to O. O. Dacus and wife, Lucile. On March 17, 1941, Bilbo C. Jones and Joseph Cullen Jones sued Dacus and wife and the two Lyons in cause No. 44733 R. D. in Part I of this Court to cancel the deed to Dacus and wife, and to require specific performance of the contract of sale by the Lyons to the Jones brothers.

"A pro confesso was taken against the two Lyons and Dacus and wife filed an answer traversing the allegations of the bill and a cross-bill seeking to have title to the land vested in them free from the claims of the complainants. An answer was filed to the cross-bill and on April 15, 1943, the cause came on to be heard before a jury. During the trial of the cause, the Chancellor held the agreements inadmissible under the Statute of Frauds, refused to submit any issue to the jury and dismissed the original bill.

"Upon appeal the Court of Appeals on May 4, reversed the case and remanded it for a new trial. About this time B. C. Jones entered the service and was released about June, 1945, at which time he and his brother contacted their attorney to try to get the case disposed of. In May, 1946, Joseph Cullen Jones died, survived by his widow Carrie Elizabeth Jones and his nine year old daughter, Thelma Carolyn Jones, one of the complainants herein. On May 9, 1947, the cause was revived in the name of Carrie Elizabeth Jones, individually and as next friend of Thelma Carolyn Jones, a minor. During all this time Bilbo C. Jones

sought by telephone and personal calls to obtain some action in the lawsuit. He had been advised by his lawyer not to spend any money improving the property although he was then in possession.

"Sometime in early 1948 Bilbo C. Jones had occasion to meet O. O. Dacus, and suggested a settlement of the lawsuit or a purchase of the land. An agreement was made between them whereby Dacus would sell the land to Jones for $2,500.00, and on March 19, 1948, Dacus and wife conveyed by warranty deed to B. C. Jones the land in question. The entire purchase price was paid by Jones.

"After the death of her father the complainant Thelma Carolyn Jones Williams, lived with her mother for about three years. In 1949 her mother became involved with the police, and on October 4, 1949, upon application of her aunt, Thelma Jones Durham, a sister of B. C. Jones, the complainant was declared a ward of the Juvenile Court of Memphis and her care and custody was given to her aunt. She lived with and was reared by her aunt until July 27, 1956, when, at the age of nineteen, she married the complainant herein, Orville H. Williams, Jr. During this interim her aunt provided generously for the complainant, feeding, clothing and educating her, and her generosity towards her niece continued after the marriage. In 1958 Thelma Carolyn Jones Williams and her husband were living in Florida where the latter was stationed in the Air Force, and in July of that year they made a trip to Memphis and visited in the home of Mrs. Durham. On June 19, 1958, the complainant had reached her twenty-first birthday.

"On July 23, 1958, Thelma Carolyn Jones Williams and her husband Orville H. Williams, Jr. went with

B. C. Jones to the Commerce Title Building to the office of the lawyer then representing B. C. Jones, and there signed a Quit Claim Deed, a Receipt and General Release and an Agreement, the instruments sought to be set aside by this suit. * * *''

The pertinent parts of the quitclaim deed, omitting the description are as follows:

## "QUIT CLAIM DEED

"KNOW ALL MEN BY THESE PRESENTS, That ORVILLE H. WILLIAMS, JR. and wife, THELMA CAROLYN JONES WILLIAMS, of the County of Shelby and State of Tennessee, for and in consideration of the sum of TEN ($10.) Dollars to them in hand paid by B. C. Jones of the County of Shelby, and State of Tennessee, do hereby bargain, sell, release, remise, quit claim and convey unto the said B. C. JONES all their right, title and interest in and to the following described real estate, to-wit:

* * * * *

"Being the same property conveyed to O. O. Dacus and wife, Lucille Dacus, as tenants by the entirety, by Robert C. Lyons, James C. Lyons and wife, Pauline Lyons, by Warranty Deed. Said Warranty Deed is recorded in book 1646 at page 482 of the Register's Office of Shelby County, Tennessee.

"All situate, lying and being in the County of Shelby and State of Tennessee, and we do hereby warrant the title herein conveyed to the said B. C. Jones against the lawful claims of all persons whomsoever claiming the same by, through or under us.

IN TESTIMONY WHEREOF, we have hereunto set our hands and seals this 23rd day of July 1958.

/s/ Thelma Carolyn Jones Williams

/s/ Orville H. Williams, Jr.

Acknowledgement''

1961''

The second document is as follows:

"RECEIPT AND GENERAL RELEASE

"TO ALL TO WHOM THESE PRESENTS SHALL COME OR MAY CONCERN, GREETING:—

"Know ye that Thelma Carolyn Jones Williams, an adult, 21 years of age, and husband, Orville H. Williams, Jr. for and in consideration of Twelve Hundred Seventy-five & No/100 ($1275.00) Dollars, receipt of which is hereby acknowledged from B. C. Jones, have remised, released and forever discharged, and by these presents do for their heirs, executors and administrators, remise, release and forever discharge the said B. C. Jones, his heirs, executors and administrators, of and from all manner of action and actions, cause and causes of actions, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, premises, variances, trespasses, damages, judgment, intents, executions, claims and demands whatsoever, in law or in equity, which against B. C. Jones the said Thelma Carolyn Jones Williams and Orville H. Williams Jr. ever had, now have or which their heirs, executors or administrators hereafter can, shall or may have for, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the date of these presents, including but not limited to all rights

of every kind whatsoever either Thelma Carolyn Jones Williams or Orville H. Williams Jr. may have, have had, can or will have in a certain cause of action in the Chancery Court of Shelby County, Tennessee, titled B. C. Jones, et al vs. O. O. Dacus, et al, No. 44733 R. D.

"In testimony whereof, the parties hereto have hereunto set their hands and seals this 23rd day of July, 1958.

/s/ Thelma Carolyn Jones Williams

/s/ Orville H. Williams, Jr.

"Subscribed and sworn to before me this 23rd day of July, 1958.

/s/ Elouise Jones
Notary Public

My Commission Expires: March 18, 1961"

The third document entitled "Agreement" is in the words and figures as follows:

## "AGREEMENT

"We, THELMA CAROLYN JONES WILLIAMS, an adult, 21 years of age, and husband, ORVILLE H. WILLIAMS, JR. for and in consideration of Twelve Hundred Seventy-five & No/100 ($1,275.00) Dollars, receipt of which is hereby acknowledged from B. C. Jones, do hereby agree that said sum is in full settlement of any and all claims of every kind whatsoever that we might have in a certain cause of action in the Chancery Court of Shelby County, Tennessee, titled B. C. Jones, et al, vs. O. O. Dacus, et al, No. 44733 R. D.

We do further agree that we will sign whatever legal documents that may be necessary in the future to effect the final disposition of said cause of action.

"Witness our hands and seals this 23rd day of July, 1958.

/s/ Thelma Carolyn Jones Williams

/s/ Orville H. Williams, Jr.

WITNESSES:

/s/ W. Preston Battle

/s/ B. C. Jones"

After Mr. and Mrs. Williams had executed the three documents they were given the check for $1,275.00 as they had been told by Mrs. Durham on the night before they would receive.

On May 25, 1948, after the deed from Dacus to Jones on March 19, 1948, an order was entered in the old case of Jones v. Dacus dismissing the cross-bill of Dacus. On January 26, 1952, Carrie Beavers Howell, mother of Carolyn, executed a quitclaim deed to any interest which she might have in the fifteen acres to the defendant, B. C. Jones, without receiving any compensation therefor.

In the spring of 1960 the complainant, Mrs. Thelma Carolyn Jones Williams, was requested to sign a motion to dismiss the original bill in the case of Jones v. Dacus. Her husband, Orville H. Williams, Jr., who had heard that the land in question was quite valuable and about to be sold consulted an attorney. Upon his advice both Mr. and Mrs. Williams refused to sign the motion to dismiss

the old suit. The present suit followed seeking to set aside the three documents hereinabove described.

Assignment of error No. III insists that His Honor the Chancellor was in error in holding that a fiduciary relationship existed between the complainants and the defendant, B. C. Jones. In our opinion the proof is just to the contrary. When J. Cullen Jones died in May, 1946, leaving surviving him only his widow and his nine year old daughter, the complainant, Thelma Carolyn Jones, they had no attorney and the defendant, B. C. Jones, assumed to act for them by having the cause of action revived in the name of Thelma Carolyn Jones and her mother, Carrie Elizabeth Jones. Up until 1948 when the defendant, B. C. Jones, took the warranty deed from Dacus the interest of B. C. Jones in the real estate involved in this litigation was exactly the same as that of the complainant, Thelma Carolyn Jones, and her mother. Whatever interest B. C. Jones had in the real estate Thelma Carolyn Jones and her mother together held the same interest. Their interests were in the Chancery Court lawsuit. Since the complainant, Thelma Carolyn Jones Williams, was a minor, her interest in the litigation and the real estate was peculiarly one to be guarded zealously by the Court.

When B. C. Jones took a deed from Dacus and wife to the real estate in question in 1948, the litigation against Dacus and wife was over. Thereafter any litigation by Carolyn Williams for her interest in the real estate would have been necessarily against B. C. Jones who then held legal title to the property under a warranty deed from Dacus. In 1949 after complainant's mother became involved with the police the defendant, B. C. Jones, and his sister, Mrs. Thelma Durham, assumed parental con-

trol of the complainant by having the Juvenile Court commit the control and custody of the minor child, Thelma Carolyn to Mrs. Durham.

■ Mr. Jones' testimony clearly shows that he recognized his confidential relationship and responsibility of protecting the interest of his niece in the real estate. We copy from his testimony as follows:

"Q Let me ask you this, Mr. Jones. Don't you think this little girl should have had someone to look into this thing for her back then and decide whether or not they should go on with the lawsuit?

"A I do not, Mr. Davis. I felt like we as her immediate family, the close relationship, were more interested and more capable of looking after this little girl's interest than any strangers that we may have selected or any other relative.

"Q So in other words you took it upon yourself then to take care of her interests?

"A I took it upon myself to protect my interest and at that time her interest in the property by obtaining this deed from Dacus."

■ A confidential relationship once established and assumed, continues until discharged by operation of law, or by order of a tribunal having requisite jurisdiction, or pursuant to a valid agreement of the parties in interest who are fully competent to contract and fully conversant with all the facts and with all their rights and duties. Bell v. Gailey, 1951, 37 Tenn.App. 17, 260 S.W.(2d) 300.

We hold that there was a confidential relationship existing between B. C. Jones and his niece, Carolyn Williams, and a confidential relationship existing between

Thelma Durham and the complainant, Thelma Carolyn Jones Williams. Therefore, assignment of error No. III is respectfully overruled.

Assignment of error No. IV insists that His Honor the Chancellor was in error in refusing to follow the jury's verdict that the defendant was not guilty of fraud. The Chancellor approved the finding of the jury. However, the Chancellor granted relief not on fraud by defendant B. C. Jones but on the absence of competent independent advice to the complainant in her dealings with defendant who stood in a confidential relationship toward her. Assignment of error No. IV is therefore respectfully overruled.

Assignments of error Nos. V, VI, VII and VIII insist that His Honor the Chancellor was in error in finding the consideration of $1,275.00 to be inadequate and grossly inadequate and in error in rescinding the quitclaim deed and other documents because of such inadequacy of consideration.

██ We concur in the finding of the Chancellor that the value of the property in July, 1958, the date of Thelma Carolyn Jones Williams' quitclaim to be approximately $21,000.00 and that her one-half interest therein was worth approximately $10,500.00. It is true as insisted by appellant that the defendant, B. C. Jones, had made substantial improvements to the property and had paid a consideration of $2,500.00 for the property in 1948. However, is is also true that the defendant, B. C. Jones, had had the use and benefit of the property under his full possession continuously from the date of institution of the original lawsuit in 1941 until the date of the quitclaim in July, 1958. Also it appears without contradiction that there was on deposit in the Chancery Court the sum of

$425.00 which was originally placed there by the complainant's father as representing his one-half of the purchase price of said property and under the terms and provisions of the release and quitclaim agreement executed by the complainant in July, 1958, this $425.00, less court costs, inured to the benefit of the defendant, B. C. Jones. Hence, we affirm the action of the Chancellor in finding that the consideration approximating a net of around $1,000.00 to the complainant for a parcel of realty worth approximately $10,000.00 was inadequate, especially so in view of the fact that the complainant was never advised by anyone as to the status of the litigation or her rights or probable rights in the real estate. These assignments of error are therefore respectfully overruled.

Assignment of error No. IX insists that His Honor the Chancellor was in error in not holding that the execution of the quitclaim deed, the release and agreement by the complainant in exchange for the sum of $1,275.00 were the result of a family settlement.

Family settlements are favored in the law. ''In cases relating to the adjustment of family disputes where the motive is to preserve the honor or peace of the family or the family property, the courts will not closely scrutinize the consideration or look into the merits of the dispute where all is fair and aboveboard. The courts will decree performance of all reasonable settlements if possible, even though they may, at times, rest on grounds which would not have been satisfactory if the transaction had occurred between mere strangers, subject, however, to a proper regard for the principles that govern the courts in the specific enforcement of compromise agreements where this form of remedy is sought.'' 11 Am.Jur.

259, Compromise and Settlement, Section 11, Family Settlements.

But it is significant to note that in Section 13 of the same Volume of Am.Jur. entitled "Rules Governing Fiduciaries" the broad general rule is laid down as follows:

"* * * Unless the parties are fully acquainted with their own rights and the nature and extent of the liability of the trustee, a full statement of all the accounts and other transactions of the trustee should unquestionably be furnished by the trustee to his cestui que trust, together with all the information required for explaining and understanding such statement. It is a universally recognized rule that the burden of proof rests on a person occupying a fiduciary relation to show that a transaction entered into between him and the person trusting him is just and fair and that no unfair advantage was derived from the fiduciary relation, but where a compromise is entered into with a trustee, not upon any reliance or confidence placed in him, but upon the advice of an independent, professional, disinterested, and competent advisor, the transaction is not voidable at the election of the beneficiary and it devolves upon him to show actual or constructive fraud."

 There is a conflict between the testimony of complainant Carolyn on the one hand and her aunt, Mrs. Durham, and her uncle, B. C. Jones, on the other in that the complainant said that she never knew of the existence of the original lawsuit. Mrs. Durham and Mr. Jones both testified that the matter had been a source of discussion in the family from time to time through the years. We agree with the Chancellor that it is not necessary to

determine the preponderance of the evidence on this question because it is admitted that neither the defendant nor Mrs. Thelma Jones Durham ever attempted to explain to the complainant, Thelma Carolyn Jones, just what interest she had, if any, in the real estate in question. The evidence in the present case comes far short of proving a family settlement favored in the law and as described in Section 11 of Vol. 11 Am.Jur., supra. Hence the assignment of error No. IX is respectfully overruled.

By assignment of error No. I the appellant, C. B. Jones, insists that no independent advice to the complainant, Carolyn Williams, was necessary for two reasons: (1) The rule of independent advice is not applicable to the relationship existing between a constructive trustee and the beneficiary of the trust; and (2) the rule of independent advice is applicable only to gift cases.

When the defendant, B. C. Jones, received a warranty deed from Dacus and wife to the fifteen acres of land which he and the complainant were jointly seeking by decree of the Chancery Court of Shelby County, Tennessee, he became constructive trustee for the complainant for one-half interest therein with an equitable lien on the one-half of the complainant to secure to him the reimbursement of one-half of the costs reasonably necessary to purchase title from Dacus. See Perkins et al. v. Johnson, 1942, 178 Tenn. 498, 160 S.W.(2d) 400; Salts et al. v. Salts et al., 1945, 28 Tenn.App. 318, 190 S.W.(2d) 188; Gibson's Suits in Chancery, Vol. 2, page 205, Section 977 entitled Constructive Trusts.

"A constructive trust, unlike an express trust, is not a fiduciary relation although the circumstances which give rise to a constructive trust may or may not involve a

fiduciary relation." A. L. I. Restatement of Restitution, Section 1808.

In the case at bar the Chancellor held that the same fiduciary relationship which brought the constructive trust into being also made it necessary that the beneficiary of the trust, Carolyn Jones Williams, have independent advice relating to the financial transactions with her uncle, the defendant, B. C. Jones.

■ There is no merit to the insistence that the rule of independent advice applies only to gift cases. For two cases to the contrary see Wilson v. Hayes, 1945, 29 Tenn.App. 49, 193 S.W.(2d) 107, and Bell v. Gailey, 1951, 37 Tenn.App. 17, 260 S.W.(2d) 300.

The law in Tennessee relating to transactions between persons occupying a fiduciary relationship is well stated in the opinion of Judge Felts, now Justice Felts of our Tennessee Supreme Court, formerly of the Middle Section of this Court, in the case of Roberts v. Chase, 1942, 25 Tenn. App. 636, 166 S.W.(2d) 641. We quote from his opinion as follows:

"* * * The fiduciary relation may be of any kind which implies confidence, as trustee and beneficiary, attorney and client, parent and child, guardian and ward, physician and patient, nurse and invalid, confidential friend and adviser, indeed, any relation of confidence between persons which gives one dominion or influence over the other. Bayliss v. Williams, supra [46 Tenn. 440]; Miller v. Proctor, supra [24 Tenn.App. 439, 145 S.W.(2d) 807]. Speaking of a transaction between parties to a fiduciary relation Mr. Pomeroy says: 'While equity does not deny the possibility of valid transactions between the two parties, yet because

every fiduciary relation implies a condition of superiority held by one of the parties over the other, in every transaction between them by which the superior party obtains a possible benefit, equity raises a presumption against its validity, and casts upon that party the burden of proving affirmatively its compliance with equitable requisites, and of thereby overcoming the presumption.' Vol. 3, p. 790.

''The presumption of invalidity extends to all dealings between persons in fiduciary and confidential relations, and embraces gifts, contracts, sales, releases, mortgages and other transactions by which the dominant party obtains a benefit from the other party. Trusts and Trustees, by Bogert, Vol. 3, sec. 493, p. 1566. The strength of the presumption varies according to the circumstances of each particular case. Where the fiduciary deals directly with his principal, the presumption of invalidity is rebuttable; but where he deals for his own account with his principal's property without the principal's knowledge, the presumption becomes conclusive. Pomeroy's Eq.Jur., Vol. 3, sec. 957. In cases where the presumption is rebuttable it can be rebutted only by clear evidence of good faith, full knowledge and of independent action and consent; or by the 'clearest and most satisfactory evidence to be adduced, that at the time the transaction took place, no advantage whatever was taken, either of the confidential relations existing in order to obtain a benefit, or of the weakness and frailty of the party from whom the benefit was received.'' Graves v. White, 4 Baxt., 38, 63 Tenn. 38, 41. If the transaction purported to be one for a consideration, the burden rests upon the fiduciary to show that the consideration was adequate. Trusts and Trustees, by Bogert, Vol. 3, sec. 493, p.

1568. The circumstances of some transactions are such that the only way in which the fiduciary can rebut the presumption of invalidity is by showing that his principal had the benefit of independent advice. Brispham's Principals of Equity, 10th Ed., p. 399; Miller v. Proctor, supra; Peyton v. William C. Peyton Corp. [23 Del. Ch. 321], 7 A(2d) 737, 123 A.L.R. 1482, and the cases collected in the annotation, 123 A.L.R. 1505.''

Assignment of error No. I is therefore respectfully overruled.

Assignment of error No. II insists that the complainant was offered independent advice when the documents were executed out of the presence of the defendant, B. C. Jones, and in the presence of Judge Battle and that the complainant, a well-educated young woman, rejected such opportunity of independent advice. Upon the argument of the cause the solicitor for the appellant, B. C. Jones, also insisted that the complainant, Carolyn Williams, received independent advice from her aunt, Mrs. Thelma Jones Durham. Therefore, we look into the circumstances surrounding the actual execution of the three documents in question to determine whether in fact the complainant, Carolyn Jones Williams, did receive the competent independent advice to which she was entitled.

At all times Mr. Jones recognized the fact that his niece had an interest in the property. On cross-examination he testified as follows:

''Q Mr. Jones, did any attorney actually tell you to go out and buy that property on your own?

''A No, sir, no attorney actually told me.

''Q So when you were relying on the advice of your attorney, you were not relying on the advice of your

attorney to go out and buy that property. You did that on your own volition?

"A I bought that property from Mr. Dacus on my own volition, yes.

"Q So when you talk in your answers here about relying on your attorney's advice, you are not talking about buying this deed from Dacus back in 1948, are you?

"A I just stated, Mr. Davis, that I did not rely on the advice of my attorney to buy this property from Mr. Dacus.

"Q Let me ask you, Mr. Jones, why didn't you take title in that property to you and this little girl?

"A Mr. Davis, it didn't occur to me that I should have anybody else's name in this title.

"Q It never occurred to you.

"A No, sir. My brother had died. We know the story about his wife, his heir was a child. I did feel she was entitled to something and I had every intention of paying whatever she was entitled to, but it did not occur to me that her name or her mother's name either one should be on the title.

"Q All right, sir. When you went out and bought that property on your own, Mr. Jones, will you tell me who represented this little girl if anyone, to protect her interest in the property?

"A As far as I know she had no legal representative.

"Q She had no legal representative?

"A No."

Sometime about 1951 Mr. John Shea who had been the solicitor for the Jones brothers in the first litigation and who had carried the case on appeal to the Court of Appeals where it was reversed and remanded for a new trial, retired from the case and turned the litigation over to his associate, Mr. Preston Battle. Mr. Battle is now Judge of Division III of the Criminal Court of Memphis Tennessee. He was not familiar with the litigation. After conference with Mr. Jones in 1951, he had Mr. Jones write him a lengthy letter giving a summary of the entire transaction up through 1951. This letter concluded with the following paragraph which the Chancellor quoted in his memorandum opinion:

"It is my desire to get a good title to the property in my wife's and my name, and to pay the child the amount she is entitled to have. I further desire that my sister, Mrs. Walter L. Durham be made guardian by the Probate Court."

Judge Battle testified that after he received the 1951 letter from Mr. Jones he made an investigation into the title to the property, the status of the lawsuit and came to the conclusion that it would be somewhat expensive for the defendant to acquire the interest of the complainant in the property while still a minor; that it would have necessitated the appointment of a general guardian; the appointment of a guardian ad litem, hiring a surveyor, an appraiser to give the value of the land, and probably some expert testimony as to the repairs and additions to the house.

Mr. Battle testified further that he advised Mr. Jones to wait until the complainant became 21 and then they could have a family settlement. Mr. Battle had never represented the complainant, Carolyn Williams; did not

know her; and had never seen her until she came to his office on July 23, 1958. As to the appointment on July 23, 1958, for the execution of the quitclaim deed, etc. Judge Battle did not remember just who made the appointment, that is, whether Mr. Jones called him or how it was arranged but he had expected all along that when the young lady got 21 there would be a settlement. On the morning of July 23, 1958, he had prepared the quitclaim deed and the release and Mr. and Mrs. Williams and Mr. Jones came to his office. He left Mr. Jones in an outer office. Judge Battle took Mr. and Mrs. Williams into one of the inner offices and handed them the quitclaim deed and the release; they appeared to be in a hurry but he insisted that they read the documents before they signed them; he left the room to prepare the third document called the "agreement." When Mr. Battle returned to the room they gave every indication of having read the documents. Judge Battle did not discuss with them the contents of the three documents. They asked for no explanation and he gave them none.

Judge Battle further explained that he thought that it was a family arrangement and that everything had been explained to Mr. and Mrs. Williams; that if they had shown any hesitancy about signing the documents or if they had indicated that they had not talked with anyone about the contents thereof he would have insisted that they consult an attorney.

Complainant Mrs. Williams testified that the first she had ever heard about clearing up the title to her uncle's farm was when she received a letter while in Florida from her aunt, Mrs. Durham, stating that when they came home that summer there were some papers to clear up the title to Uncle Bill's property that Mrs. Durham

wanted them to get signed; that when she came home in July, 1958, on the night before the papers were signed Mrs. Durham explained to her and Mr. Williams that she wanted them to go down to Mr. Battle's office the next day to sign the papers to clear up the title to Uncle Bill's property; that he was going to give them $1,275.00; even though he did not owe anything he wanted them to have it. She stated that she asked her aunt no questions because she understood that Uncle Bill needed to make some improvements on the property and needed them to sign the papers to clear up the title; that they did not see or talk to Mr. Jones at all but that on the next morning they met him in the lobby of the Commerce Title Building before going up to Mr. Battle's office.

Mrs. Williams testified that they signed all the papers presented to them by Mr. Battle without asking any questions and without actually reading the documents though they did scan them over and Mr. Williams inserted the letters ''Jr.'' after his name on one or more documents because he signed his name Orville Williams, Jr. Mrs. Williams affirmatively testified that she had no idea that she had any interest in any property but thought that the property belonged to her Uncle Bill; that she never discussed with the defendant, Mr. Jones, anything about her interest in the property. Mrs. Williams stated that her aunt, Mrs. Durham, had been very kind to her and had been very generous with her, had sent her to college for one year and wanted her to go longer before she married and that after she had married she had given her as much as $1,000.00 in one gift; that in her opinion her aunt, Mrs. Durham, would not do anything to mistreat her.

The aunt, Mrs. Thelma Durham, testified as a witness for the defendant, that she was familiar with the litiga-

tion instituted by her two brothers back in 1941. Also she testified that her brother, B. C. Jones, had said on many occasions that he expected to pay their niece, Mrs. Williams, for the property whatever her fair share might be. Mrs. Durham corroborated the testimony of the complainant that on the night before July 23, 1958, she related the information to Mr. and Mrs. Williams that there would be a meeting in Mr. Battle's office the next morning for the execution of the documents; that Mr. Jones would make her an offer for her interest in the property and that her niece stated that she did not want him to pay her anything. We quote her testimony as follows:

"Q It was your request to Mr. Williams and Mrs. Williams then that they go and get an explanation of all the facts concerning this matter?

"A That was the purpose of the meeting for them to have that opportunity.

"Q And you conveyed that information to them?

"A Yes.

"Q Go ahead then.

"A Carolyn contributed to the conversation that she did not want Uncle Bill to pay her any money. .

"Q Let me stop you there. Prior to making that statement did you say that Uncle Bill did not owe her any money?

"A No, I believe the information I conveyed to them was that they were prepared to make her an offer for her interest and she stated that she did not want him to pay her any money. I told her that he was prepared to pay her the money and she said, well, if he does pay

me any money I would rather wait until we get out of service and I advised her that if the amount was agreed upon and the money was offered, that rather than leave it in someone else's hand for the duration of the time they would be in service, that she accept the money and that she have it at her disposal and have it as an emergency fund for herself and child and her husband, and that the interest on that money be her's rather than leave it in somebody else's hand for their benefit.

"THE COURT: Did you tell Mrs. Williams how much would be offered?

"THE WITNESS: I didn't know how much would be offered. I didn't know how much there was, except an approximate amount.

"THE COURT: Did you have any idea how much would be offered?

"THE WITNESS: Yes.

"THE COURT: What did you say might be offered?

"THE WITNESS: In excess of twelve hundred dollars.

"THE COURT: You had no idea yourself as to the amount that was going to be offered?

"THE WITNESS: I knew that an amount had been discussed.

"THE COURT: Twelve hundred dollars?

"THE WITNESS: An amount in excess of twelve hundred dollars had been discussed and had been deemed a generous amount.

"THE COURT: Had that amount ever been discussed with you?

"THE WITNESS: Yes, about that point. It was not until about that point that any amount had been arrived at.

"THE COURT: Just right around that time there was some discussion about how much Mr. Jones was going to pay Mrs. Williams for her interest or her claim in the settlement, is that right?

"THE WITNESS: Yes.

"THE COURT: And you and he discussed it or did he tell you what the figure would be? When I use the word discussion, did he tell you what he was going to pay or did he ask you what you thought ought to be paid?

"THE WITNESS: I was not asked as such. I could not have made—

"THE COURT: In other words, you expressed no opinion, nor were you asked to express an opinion as to the amount that might be paid?

"THE WITNESS: No.

"THE COURT: You were informed?

"THE WITNESS: Well, I actually overheard it, I was not, I didn't have any voice in it.

"THE COURT: And your suggestion to Mrs. Williams was a result of what you overheard?

"THE WITNESS: Well, of the general discussion on the progress being made on the situation.

"THE COURT: So that when you suggested to Mrs. Williams and her husband that they go down the next day and see the lawyer, you had no information from

anyone directly as to how much they were going to get?

"THE WITNESS: That's right.

"THE COURT: You had the figure of twelve hundred or in excess thereof in your mind?

"THE WITNESS: Yes.

"THE COURT: Having overheard that.

"THE WITNESS: I had acquired that from the discussion.

"THE COURT: I understood you to use the word overheard.

"THE WITNESS: Well, yes.

"THE COURT: I don't want to imply it was an eavesdropping situation, but I assume you meant the conservation was between other parties where you were present.

"THE WITNESS: Well, if I may, I would like to differentiate the difference in my learning—this was discussed and this amount was arrived at without my being present. I only learned of it after that discussion when the information was, I was asked to relay the information. That was—

"THE COURT: Then overheard was not probably an apt expression. In other words what you are telling us is that Mr. Jones either alone or with some other person arrived at the figure he was prepared to offer?

"THE WITNESS: That's right.

"THE COURT: And you learned that information—

"THE WITNESS: Through the information I was to convey.

"THE COURT: Whom did you learn that from?

"THE WITNESS: From Mr. Jones, and as a result of conveying the information.

"THE COURT: Isn't it a fact that Mr. Jones told you that he was prepared to pay them a certain amount?

"THE WITNESS: This was the amount arrived at.

"THE COURT: What amount did he tell you?

"THE WITNESS: I didn't remember at that time whether it was twelve fifty of twelve seventy-five.

"THE COURT: So it was either twelve fifty or twelve seventy-five?

"THE WITNESS: That's right."

Further, Mrs. Durham testified that she had explained to the complainant that her father had invested only a very small amount of money in the property and that in view of the fact that her brother had put up all the money to buy the property and had taken care of it, that his offer was very reasonable and generous under all the circumstances.

Very probably both Mr. Jones and his sister, Mrs. Durham felt that Mr. Jones was entitled to the full ownership of the fifteen acres of land and that he was only obligated to pay Carolyn an amount which would include a return of the $425.00 deposit made by her father plus interest accrued over the years and plus maybe a small amount for good measure and very probably both Mr.

Jones and Mrs. Durham thought that $1,275.00 was a fair and generous payment to Carolyn.

However, they stood in a fiduciary relationship toward Carolyn and it was their responsibility to acquaint her with the full information concerning her rights and interest in the property before buying it from her. This they did not do. Mr. Jones negotiated with Carolyn through Mrs. Durham for the execution of the quitclaim deed and release. Mrs. Durham was very guarded in her explanation to Carolyn as to why her signature was needed. Carolyn was sent to the lawyer's office the next morning and signed the quitclaim deed without ever having explained to her by anyone that she had an interest in the fifteen acres of land and an interest in the return of the $425.00 deposit in Chancery Court, all of which she was selling for $1,275.00.

It may well be that Mrs. Durham did not fully understand that Carolyn had an interest in the property which she was selling for about $1,000.00 net. Certainly Mr. Jones knew or was chargeable with knowledge because he had the full advice of his counsel in 1951 as to the procedure necessary to get a clear title to the property. Judge Battle had already advised him that in order for him to get Carolyn's interest in the property while Carolyn was still a minor it woud be necessary for a guardian ad litem to be appointed to represent Carolyn and the Court would require proof as to the value of the property and the value of Carolyn's interest therein and it would be necessary that a general guardian be appointed to receive the money paid to Carolyn therefor.

■ Admittedly Judge Battle did not advise Mrs. Williams in any manner about her rights in the property. Under all the circumstances we hold that Mrs. Durham

was not qualified to and did not give Carolyn the independent advice to which she was entitled in order to transact intelligently the business with her uncle with whom she stood in a fiduciary relationship. Assignment of error No. II is therefore respectfully overruled.

■■■ Assignment of error No. X insists that the Chancellor was in error in holding as a matter of law that in "1958 the complainant was the equitable owner of an undivided one-half interest subject to the adjustment of the debits and credits between the co-tenants." The Chancellor relied upon the case of Perkins et al v. Johnson, 1942, 178 Tenn. 498, 160 S.W.(2d) 400, from which we quote as follows:

"We think the chancellor properly sustained the bill as one to impress a trust upon the land purchased by defendant in favor of complainants and defendant as heirs of their father, and as tenants in common, subject to their mother's life estate.

"The general rule is that tenants in common 'cannot buy in the common property at a tax sale, or foreclosure sale, or buy in an outstanding title or other overhead claim, except for the benefit of all. This is the doctrine of Tisdale v. Tisdale (2 Sneed 596), 34 Tenn. 596, 64 Am.Dec. 775; Williams v. Gideon (7 Heisk. 617), 54 Tenn. 617; Sharp v. Williams, 1 Shannon Cas., 76; Saunders v. Woolman & Co., (7 Lea 300), 75 Tenn. 300; Harrison v. Winston, 2 Tenn. Ch. 544; Watson v. Ryan, 3 Tenn. Ch. 40.' Davis v. Solari, 132 Tenn. 225, 177 S.W. 939.

The reasons for this rule are thus stated in Tisdale v. Tisdale (2 Sneed 596), 34 Tenn. 596, 64 Am.Dec. 775:

" 'Tenants in common by descent, are placed in a confidential relation to each other, by operation of law, as to the joint property, and the same duties are imposed as if a joint trust were created by contract between them, or the act of a third party. It may be different, where they claim title by distinct purchases, even of the same original title, but that is not the case before us. Being then interested with, and for each other, in the property, each one is prohibited from acquiring rights in it, antagonistic to the others. 1 White & Tudor, 53. Being associated in interest as tenants in common by descent, an implied obligation exists to sustain the common interest. This reciprocal obligation will be vindicated and enforced in a court of equity, as a trust. These relations of trust and confidence bind all to put forth their best exertions, and to embrace every opportunity to protect and secure the common interest, and forbid the assumption of a hostile attitude by either; and therefore, the purchase by one of an outstanding title, or an incumbrance upon the joint estate, in his own name, will enure to the equal benefit of all, but they will be compelled to contribute their respective ratios of the consideration actually given.'

"As noted in Davis v. Solari, supra, there are some exceptions to this rule resulting from agreements between the tenants in common with respect to the purchase by one of them at a tax sale. We find no such exceptional circumstances in the case before us. As above stated, the complainants say that they knew nothing about the tax sale."

We think His Honor the Chancellor was correct and assignment of error No. X is overruled.

Assignments of error XI and XII insist that His Honor the Chancellor had authority to set aside the solemn written obligations of the complainants only on the ground of fraud and that since the jury had found the defendant not guilty of fraud and this finding was approved by the Chancellor the order setting said written instruments aside was erroneous. These matters have been covered elsewhere in this opinion and these assignments of error are overruled.

All of the assignments of error by the appellant, B. C. Jones, having been overruled we now consider the assignments of error by complainants-appellees.

It is unnecessary to discuss the complainants-appellees' twenty-two assignments of error. They insist that the Chancellor was in error in failing to find the defendant, B. C. Jones, guilty of actual fraud against the complainants and they further insist that His Honor the Chancellor should have awarded punitive damages. The jury found the defendant, B. C. Jones, free from actual fraud and the Chancellor concurred in this finding. The evidence does not preponderate against the finding of the Chancellor on this question and we think punitive damages would be inappropriate under all the facts of this case.

Admittedly the fifteen acres involved in this litigation have increased in value greatly since 1958 when their value was $21,000.00. The complainant, Mr. Williams, testified that he heard some member of the family say that Uncle Bill was planning to sell his farm for $100,000.00 which led ultimately to the present lawsuit. While that figure of $100,000.00 is probably an exaggeration or else included some additional property owned by Mr. Jones, yet this court knows from other litigation before

it that property values in Shelby County have been steadily increasing over the past several years in and around Germantown. There is every reason to believe that the property has increased in value since the bill was filed in 1960.

After full adjustment of debits and credits between the complainant, Carolyn Williams, and her uncle, the defendant B. C. Jones, she will in all probability receive a very substantial amount of money as a direct result of the defendant, B. C. Jones, having furnished the money for the settlement of the suit with Dacus back in 1948 while the complainant was a child of tender years. Under these circumstances we think it would be most inequitable to assess the defendant, B. C. Jones, with punitive damages. Hence, all the assignments of error of the complainants-appellees are respectfully overruled.

The decree of the Chancellor below will in all things be affirmed and the cause remanded to the lower court for further proceedings consistent herewith. The costs of this appeal will be taxed against the defendant, B. C. Jones. The costs in the court below will be taxed by His Honor the Chancellor.

Avery P. J. (W. S.), and Bejach, J., concur.