IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
January 25, 2017 Session

## TONY FRANK ET AL. v. RONNIE FIELDS

**Appeal from the Chancery Court for Monroe County**
**No. 17,982     Jerri S. Bryant, Chancellor**

_____

### No. E2016-00809-COA-R3-CV

_____

This case involves a claim of undue influence against an attorney-in-fact for his role in changing bank accounts and certificates of deposit owned by the principal to be payable on death to the attorney-in-fact. The principal, or decedent in this action, died at the age of ninety-five in January 2012. The decedent was survived by two nieces and three nephews, one of whom, the defendant, was the decedent's attorney-in-fact and the personal representative of his estate. The decedent's two nieces and one other nephew filed a complaint alleging undue influence arising from a confidential relationship. Following a bench trial, the trial court dismissed the complaint upon finding that although a presumption of undue influence had been raised by a confidential relationship between the attorney-in-fact and the decedent, the attorney-in-fact had successfully rebutted the presumption. The plaintiffs appeal. Discerning no reversible error, we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and FRANK G. CLEMENT, JR., P.J., M.S., joined.

J. Lewis Kinnard, Madisonville, Tennessee, and Keith McCord, Knoxville, Tennessee, for the appellants, Tony Frank, Joyce Dodd, and Teresa Hipps.

John W. Cleveland, Sr., Sweetwater, Tennessee, and Doris A. Matthews, Madisonville, Tennessee, for the appellee, Ronnie Fields.

## OPINION

### I. Factual and Procedural Background

The decedent, Ray L. Frank ("Decedent") was one of six children. He died without issue or a surviving spouse. The plaintiffs, Tony Frank, Joyce Dodd, and Teresa Hipps (collectively, "Plaintiffs"), are, respectively, a nephew and two nieces of Decedent, each born to a different sibling. The defendant, Ronnie Fields ("Mr. Fields"), is also Decedent's nephew. Tony Frank is the son of Ralph Frank, Decedent's brother, and Ms. Hipps is the daughter of Gavin Frank, another of Decedent's brothers. Ms. Dodd and Mr. Fields are both the children of Mable Fields, Decedent's sister ("Ms. Fields"). Decedent had one other living nephew at the time of his death, Scott Frank, who is the brother of Ms. Hipps and is not participating in this action. All of the parties participating in this appeal testified during trial.

In its memorandum opinion incorporated into the final judgment, the trial court found that beginning in the 1990s, Decedent and his two sisters, Ms. Fields and Beuna Black ("Ms. Black"), "all tried to take care of each other, and they did that from time to time based on the health of the people that were around them at the time."[1] In the 1990s, Decedent, Ms. Fields, and Ms. Black resided in separate residences in Vonore, Tennessee. At some point prior to 2004, Decedent began to lose his eyesight, and his sisters visited him regularly to check on him. It is undisputed that the ability of Decedent's sisters to provide assistance to him began to change in 2004. Ms. Dodd testified that Ms. Fields and Ms. Black both began to suffer from Alzheimer's Disease in 2003 to 2004.

Mr. Fields testified that he left his twenty-year position as Vice-President of Managing and Distribution for Lion Apparel in Dayton, Ohio, to relocate to Monroe County, where he had grown up, in 2004. Mr. Fields had previously built a home of his own in Monroe County in 1997. According to Mr. Fields, his wife, Linda Fields, developed lung cancer in 2004, causing him to leave his employment in order to spend more time with her in their Monroe County home. Mr. Fields further testified that when he relocated, he began visiting Decedent nearly every day and transporting Decedent to appointments and "anywhere he wanted to go." Mr. Fields stated that he would typically visit Decedent at lunchtime, explaining that Decedent had meals delivered to him by Meals on Wheels but enjoyed having someone "put his food on the table for him and get it ready for him to eat because he couldn't see very well." Mr. Fields and Ms. Dodd each testified that Decedent had a live-in caregiver for at least a few months, Hazel E. Mr.

---

[1] The spelling of Ms. Black's given name varies in the record. We have adopted the spelling, "Beuna," used by Ms. Black when she signed her own last will and testament.

Fields maintained that he secured Hazel E. to reside with and assist Decedent. According to Mr. Fields, Hazel E. was approximately eighty years old at the time.

Testimony demonstrated that at different times from 2010 to 2011, Decedent and both of his sisters relocated to senior care facilities. Ms. Black was the first of the siblings to move into Wood Village Nursing Home ("Wood Village") in Sweetwater, followed soon after by Ms. Fields. Ms. Dodd explained that Ms. Fields had been residing with her for approximately five and one-half years prior to Ms. Fields's breaking her knee and requiring additional care. In 2010, Decedent resided for approximately six months at a nursing home in Vonore known as Rivers Edge. Mr. Fields testified that he moved Decedent to Rivers Edge after Hazel E. could no longer care for him and Mr. Fields could not find anyone to stay with Decedent at night. Mr. Fields further related that he moved Decedent to another nursing home for a short time but, finding that nursing home unsatisfactory, relocated Decedent to the assisted living section of the Wood Village facility, known as The Lodge at Wood Village. According to Mr. Fields, Decedent resided at Wood Village for approximately one year, during which time Mr. Fields regularly visited Decedent on Mondays, Wednesdays, and Fridays, often taking Decedent out to eat. Mr. Fields explained that he transported Decedent to all types of appointments, including those with Decedent's doctors and attorney.

Ms. Dodd testified that she remembered moving Ms. Fields and Decedent into Wood Village on the same day. After approximately one year in the assisted living division of Wood Village, Decedent moved to the nursing home division for only a few months before his final hospitalization. Ms. Dodd stated that she also assisted with Decedent's medical appointments during this time, explaining that Mr. Fields would transport Decedent from whichever facility he was in and call her when they arrived in Maryville where the doctor's office was located. According to Ms. Dodd, she would then accompany Decedent during his appointment.

Testimony demonstrated that Ms. Black died in 2011, although the exact date is not clear in the record. Decedent died of natural causes at the University of Tennessee Medical Center on January 18, 2012, following hospitalization lasting approximately a week and a half. He was ninety-five years of age. Although Ms. Fields was still living at the time of Decedent's death, she died during the pendency of this action.

Decedent and his sisters executed various powers of attorney during the final years of their lives. On May 16, 2005, Ms. Fields executed a power of attorney appointing Mr. Fields as her attorney-in-fact. She concomitantly executed a last will and testament, bequeathing her entire estate to her children, Mr. Fields and Ms. Dodd. On October 20, 2005, Decedent executed a power of attorney appointing Mr. Fields as his attorney-in-fact. Mr. Fields testified that once Ms. Black began experiencing difficulty

3

handling Decedent's accounts and was having trouble handling her own, Decedent asked Mr. Fields to be his attorney-in-fact. In May 2006, Ms. Black executed two powers of attorney, each time appointing Mr. Fields and Scott Frank as her attorneys-in-fact. In the second document, Ms. Black removed a provision withholding the authority of the attorneys-in-fact until her disability. On December 2, 2010, Decedent executed a second power of attorney appointing Mr. Fields as his attorney-in-fact.

In Ms. Black's last will and testament, executed on June 18, 2002, she devised and bequeathed 25% of her real and personal property to Decedent, provided that he survived her by thirty days, and equally to Mr. Fields and Scott Frank if Decedent failed to survive her. She devised and bequeathed the remaining 75% of her estate in equal sixths to Ms. Fields, Mr. Fields, Ms. Dodd, Scott Frank, Kim Frank, and Brittany Frank. In her will, Ms. Black appointed Mr. Fields and Scott Frank as co-executors. Mr. Fields testified that he had served as the executor of Ms. Black's estate.

Decedent had executed four successive wills that were presented as exhibits during trial and are in the record before us. First, on July 13, 1990, Decedent executed a last will and testament, devising and bequeathing all of his real and personal property to his wife, Mary Belle Frank. In the event that his wife predeceased him, Decedent, apart from specific items of personal property bequeated to individuals, devised and bequeathed the remainder of his real and personal property 12.5% to Ms. Fields, 12.5% to Ms. Black, 12.5% to Charles Gavin Frank, 25% to Tyson Kinser, 12.5% to the heirs at law of Ralph Frank, and 25% to the heirs at law of Albert Kinser. According to an inheritance tax return filed by Mr. Fields subsequent to Decedent's death, Decedent's wife died on November 5, 1994.

Decedent executed a second last will and testament on November 4, 1999, devising and bequeathing his entire estate, except a dining room table and chairs, equally to Ms. Fields and Ms. Black. In this second will, Decedent designated Ms. Black as his executrix and Ms. Fields as his substitute executrix. In August 2002, Decedent executed a power of attorney appointing Ms. Black as his attorney-in-fact.

On April 21, 2005, Decedent executed a third last will and testament, devising and bequeathing all his real and personal property, with the exception of the oak dining room set, 25% to Ms. Fields and 25% to Ms. Black, provided that each sister, respectively, survived him by thirty days. He bequeathed and devised the remaining 50% of his real and personal property in equal one-sixth shares to Mr. Fields, Ms. Dodd, Ms. Hipps, Tony Frank, Scott Frank, and Randy Frank. In this testamentary instrument, Decedent appointed Ms. Black as his executrix and Mr. Fields as his substitute executor. Decedent directed that his executrix or executor should sell all of his real and personal property with the proceeds to be apportioned according to the will.

4

Finally, on December 2, 2010, Decedent executed a last will and testament, again devising and bequeathing all his real and personal property, with the exception of the dining room set, 25% to Ms. Fields and 25% to Ms. Black, provided that each survived him by thirty days. He bequeathed and devised the remaining 50% of his real and personal property in equal one-fifth shares to Mr. Fields, Ms. Dodd, Ms. Hipps, Tony Frank, and Scott Frank. In this final will, Decedent appointed Mr. Fields as his executor and Mr. Fields's son, Michael Fields, as his substitute executor. Mr. Fields executed a petition to probate Decedent's 2010 will with the Monroe County Probate Court on February 10, 2012. Although the record in this matter does not contain a date-stamped copy of the probate petition, Mr. Fields's counsel's certificate of service indicates that counsel sent a copy of the petition and will to each of the individual legatees named therein on February 13, 2012. According to a copy attached to Plaintiffs' complaint in this action, letters testamentary were issued to Mr. Fields by the Monroe County Probate Court on March 7, 2012.

At issue in the instant action is Mr. Fields's involvement in two checking accounts and three certificate of deposit ("CD") accounts originally opened by Decedent. At the time of Decedent's death, both of the checking accounts, one with Volunteer Federal Savings Bank in Vonore ("Volunteer Federal") and a money market account with Citizens National Bank in Vonore ("Citizens National"), were designated as payable on death ("POD") to Mr. Fields. *See* Tenn. Code Ann. § 45-2-704(b)(1) (2007).[2] One of the three CD accounts was with Volunteer Federal and was designated as POD to Mr. Fields. Two of the CD accounts were with Citizens National, one designated as POD equally to Mr. Fields and Scott Frank, and the other owned by Mr. Fields as the last surviving owner upon Decedent's death.

---

[2] Tennessee Code Annotated § 45-2-704(b)(1) provides:

> Any person, or persons jointly as tenants with right of survivorship, owning a deposit account may enter into a written contract with any bank whereby the balance of the deposit account may be made payable on the death of the last surviving owner to another person or persons, notwithstanding any provisions of law to the contrary.

*See George v. Warmath*, No. 02A01-9807-PB-00183, 1999 WL 323502, at *5 (Tenn. Ct. App. May 24, 1999) ("As with joint accounts with right of survivorship and in appropriate circumstances, payable-on-death funds are no longer owned by the decedent at death and do not become a part of the assets of the decedent's estate.") (citing Tenn. Code Ann. § 45-2-704(b)).

Bank records demonstrate that over the course of two days on January 26 and 27, 2012, Mr. Fields removed, in the form of bank checks made out to himself, $228,887.72 from Decedent's Citizens National accounts and $229,902.95 from Decedent's Volunteer Federal Savings accounts. In addition, Citizens National concomitantly issued a bank check made payable in the amount of $15,011.10 to Scott Frank, representative of Scott Frank's fifty-percent POD interest in one of the Citizens National CD accounts. Decedent's Citizens National checking account and one CD account were completely closed on January 26, 2012, while the CD account POD to Mr. Fields and Scott Frank was closed the next day. The Volunteer Federal CD accounts were also closed on January 27, 2012. The Volunteer Federal money market checking account remained open until Mr. Fields closed it by removing $91.20 in accrued interest on March 19, 2012. Mr. Fields does not dispute that he kept the funds designated as POD to him for his own use.

On March 11, 2013, Plaintiffs and Ms. Fields filed a complaint alleging, as pertinent to this appeal, that Mr. Fields had "exercised undue influence" over Decedent and taken "advantage of his confidential position to obtain control of all the liquid assets" of Decedent, allegedly depriving Plaintiffs of the "legacy which [Decedent] intended." Plaintiffs attached copies of Decedent's 2010 will and power of attorney, the letters testamentary issued to Mr. Fields, and a copy of the Tennessee Short Form Inheritance Tax Return executed by Mr. Fields on August 7, 2012, in his capacity as executor of Decedent's estate. The tax return reflected a gross estate value of $538,059.30, comprised of real estate estimated to be worth $84,400.00 and "Personal and Miscellaneous Property" valued at $453,659.30. In an attachment to the return, Mr. Fields delineated the following as "Personal and Miscellaneous Property":

| | |
|---|---|
| Household Furnishings | $ 2,000.00 |
| Volunteer Federal (CD) | 128,902.95 |
| Volunteer Federal (ckg. acct.) | 101,000.00 |
| Citizens National Bank (CD) | 40,000.00 |
| Citizens National Bank (CD) | 15,011.09 |
| Citizens National Bank (MM acct.) | 166,745.26 |
| | |
| Total | $ 453,659.30 |

Mr. Fields deducted $11,391.55 in funeral and estate expenses, for a net estate worth claimed on the tax return of $526,667.75.

Bank records demonstrate that the total amount withdrawn from Decedent's accounts and paid to Mr. Fields was actually $458,881.87, and Plaintiffs have requested

6

that this amount be returned to the estate. The Citizens National CD account ending in 678 was liquidated for a total of $47,131.36, rather than $40,000.00 as stated in the inheritance tax return, and Mr. Fields did not include on the return $91.20 in accrued interest on the Volunteer Federal checking account, subsequently withdrawn in March 2012. Plaintiffs have made no claim regarding the estimated $2,000.00 in household furnishings or the $15,011.10 paid upon Decedent's death to Scott Frank from the Citizens National CD ending in 874. Mr. Fields does not dispute on appeal that the total amount of funds he received was $458,881.87. Mr. Fields testified that in his capacity as executor, he had subsequently sold Decedent's home and deposited the proceeds in the estate account. Mr. Fields acknowledged that the amount available in the estate account for distribution according to Decedent's will was $102,000.00. He explained that distribution of the estate account awaited completion of the instant action.

In their complaint, Plaintiffs requested that the trial court, *inter alia*, require Mr. Fields to account for the funds removed from Decedent's accounts in January 2012 and require Mr. Fields to reimburse Decedent's estate. Mr. Fields filed an answer on April 10, 2013, denying all substantive allegations. He also averred that Ms. Fields was not competent to be a party to this action and that as Ms. Fields's attorney-in-fact, he had not consented to her inclusion as a party.

On January 27, 2014, Plaintiffs filed a motion for summary judgment and statement of material facts, attaching, in addition to materials previously filed, bank records, deposition testimony proferred by Michael Fields, and an affidavit executed by Ms. Dodd. Mr. Fields filed a response and a statement of material facts on March 4, 2014, attaching a record of checks written by Mr. Fields on Decedent's accounts for Decedent's expenses, as well as affidavits executed by Sheila Phillips, a new account representative with Volunteer Federal who had assisted Decedent with his banking needs, and Kay Grubb, a customer service representative at Citizens National. Following a hearing conducted on April 30, 2014, the trial court denied Plaintiffs' motion for summary judgment in an order entered May 30, 2014.

On August 11, 2015, the trial court entered an order directing, upon the parties' agreement, that the assets in question "should be held intact in the investments arranged by [Mr. Fields]." The court subsequently entered an agreed order on January 11, 2016, dismissing Ms. Fields's claim upon finding that Ms. Fields had died testate on February 19, 2014. The court noted that the two beneficiaries of Ms. Fields's estate, Ms. Dodd and Mr. Fields, were already parties to this action.

The trial court conducted a trial over the course of two days on February 17 and 18, 2016. Witnesses included the parties; Ms. Phillips; Ms. Grubb; John M. Carson, III, an attorney who had prepared Decedent's wills and powers of attorney designating Mr.

7

Fields as attorney-in-fact; Robin Williamson, a former employee of Rivers Edge who had provided care to Decedent for approximately six months; and Michael W. Abel, Sr., who had often accompanied Ms. Dodd when she visited Decedent and Ms. Fields at Wood Village. All relevant testimony and medical assessments presented at trial demonstrated that although Decedent was blind or nearly blind throughout the last few years of his life, he suffered from no mental or cognitive impairment. Each of the plaintiffs testified, respectively, that Decedent appeared to remain mentally independent, alert, and aware of those around him. Plaintiffs acknowledged that Mr. Fields never inhibited their abilities to visit with Decedent. Ms. Dodd testified that she did not suspect Mr. Fields of undue influence until she received information regarding the estate following Decedent's death.

Mr. Carson testified that he had practiced law in Madisonville for nearly thirty years and had known Decedent since before he began practicing law. In addition to preparing Decedent's testamentary documents and powers of attorney, Mr. Carson had also prepared such documents for Ms. Black and Ms. Fields. Mr. Carson related that when he prepared Decedent's wills and powers of attorney, he spoke with Decedent in private regarding Decedent's wishes. He remembered conversations with Decedent over the years about Decedent's wife's health, his sisters' health, and his desire to have his real property liquidated for his estate. According to Mr. Carson, although he did not remember the specific conversation, he was sure he would have explained to Decedent that accounts designated POD would pass to the beneficiary outside the estate. Mr. Carson described his typical procedure as follows:

> As far as to how names were on bank accounts or so forth, I have a specific litany that I follow every time that I execute a will. I don't remember any specific dialogue with [Decedent], but I know that in every single will that I execute, there's the same pattern and dialogue that happens with every execution. And part of that litany or part of that dialogue when – I generally will always notarize the document. I have one or two of my paralegals or somebody else witness the document. I notarize the document. We get everything signed. I send [a paralegal] to go make my office copy and then I explain to whoever is sitting there as part of my litany, we're sending the original home with you, you have to put that up in a safe place, that the copy that we keep here is only for our records. . . . I specifically remind them, as I have told them in the introductory portion, that recall there are certain assets that pass outside of your estate, life insurance policies or contracts that you have with a company to pay a beneficiary upon your death, so that won't be covered by this, and specifically refer to jointly held bank accounts will pass to the joint account holder. I remind them not to put their name on anybody's account that they

8

don't want to own that. . . . So that's just part of the same litany I roll through every time . . . .

Concerning Decedent's physical and mental condition when he executed the documents, Mr. Carson testified:

[T]hrough the years that I had seen [Decedent], his eyesight continued to fail him, and although his mind remained sharp, he was – or as far as I could tell for all intents and purposes blind at the time he executed this last document. I know that we read that out to him completely full and out loud as opposed to having him review it individually.

Mr. Carson explained that when a client executes a will, he has "whoever else go back out and wait in the lobby." Mr. Carson specifically remembered having a "younger fellow," subsequently identified as Michael Fields, wait in the lobby while he spoke with Decedent alone. According to Mr. Carson, on the last occasion that he came into the office, Decedent "was sort of joking with [Mr. Carson] that he was outliving everybody" and stated that "[h]e hated to come back and make another change but he was outliving folks." Mr. Carson acknowledged that because Decedent began to have trouble climbing the stairs to Mr. Carson's former office, Mr. Carson "did go down to the car and see him" on at least two occasions. Mr. Fields testified, in turn, that he was present when Decedent executed his most recent will and that Decedent did so in Mr. Fields's car with Mr. Carson and Mr. Carson's assistant also in the car because it was raining outside.

Ms. Phillips and Ms. Grubb each respectively testified that Decedent appeared to know his surroundings and understand the purpose of his banking transactions. Ms. Phillips explained that she had been employed with Volunteer Federal since 1999 and had worked at the Vonore branch since it opened in 2002. She had assisted Decedent with his accounts since the opening of the Vonore branch. Ms. Phillips stated that in 2002, Decedent would come in and do business on his own. She related that by about 2004, Decedent began needing someone to assist him and that he would usually have either Ms. Black, Ms. Fields, or Mr. Fields with him. When questioned regarding the "last couple of years" of Decedent's life, Ms. Phillips stated that Decedent was accompanied by Mr. Fields.

As Ms. Phillips reviewed banking records presented by Plaintiffs, she noted that Mr. Fields's wife Linda had been added to the Volunteer Federal checking account as a signatory at some point prior to August 14, 2006, because Mr. Fields "was having a hard time . . . writing the checks, and so we added Linda on there as signatory so she could

9

write the checks to pay whatever for [Decedent]."[3] Ms. Phillips acknowledged that the signature card adding Linda Fields was undated but explained that it predated an August 14, 2006 signature card. When questioned regarding whether she remembered the particular instance when Mr. Fields, acting as Decedent's attorney-in-fact, added Ms. Fields as a signatory, Ms. Phillips responded:

> I don't, but if [Decedent] wasn't with [Mr. Fields], it was my best habit to call – I would call – if [Decedent] wasn't physically with [Mr. Fields] in the bank, I would call [Decedent] on the phone or he would call me, and I would ask, you know, what he wanted to do on these accounts.
>
> * * *
>
> I would have either – I didn't make a note of it, no, I did not. But I would have – I feel like I would have either talked to [Decedent] on the phone or he would have called me before I would have made the change.

Ms. Phillips maintained that she recognized Decedent's voice on the telephone and that when she made a change to an account without speaking with Decedent on the telephone, it was because he was physically present at the bank. When questioned regarding whether she recalled explaining to Decedent what a payable-on-death designation meant, Ms. Phillips testified:

> I don't specifically remember. But like I said, if I had listed it on there, he would have had to ask me or, you know, if someone else had requested it I would have talked with him about it to make sure that was his wishes, that that's what he wanted on the account.

Ms. Grubb testified that she had been employed with Citizens National at the Vonore branch since approximately 2002 and had known Decedent for forty or fifty years. She also testified that she had assisted Decedent with his checking and CD accounts since very soon after she began working for Citizens National. Ms. Grubb stated that when Decedent opened or made changes to his accounts, he was present and instructed her regarding how he wanted them set up. She explained that once Decedent's eyesight began to fail, either Mr. Fields or one of Decedent's sisters would transport him to the bank. She further explained that later when Decedent had become blind, it was always Mr. Fields who accompanied him. Ms. Grubb acknowledged that in later years, Decedent was not able to come into the bank himself, but she maintained that Decedent did not make changes to the Citizens National accounts at that time. Ms. Grubb opined

---

[3] During trial, Mr. Fields's counsel noted for the record, without objection, that Mr. Fields suffered from Parkinson's Disease.

that Decedent knew his surroundings and knew her.  She stated that she had no reason to believe Decedent was not competent to make decisions.

Related to Decedent's checking and CD accounts, the trial court in its final decree delineated a timeline of events, which the parties do not dispute.  The following is a summary of the events affecting each account, as noted in the final decree and evinced by the exhibits presented at trial:

<u>Volunteer Federal Checking Account</u>

| | |
|---|---|
| September 9, 2002: | Decedent opened account. |
| September 20, 2004: | Decedent designated the account as POD to Ms. Black and Ms. Fields. |
| October 20, 2005: | Decedent appointed Mr. Fields as his attorney-in-fact. |
| May 4, 2006: | Ms. Black appointed Mr. Fields and Scott Frank as her attorneys-in-fact. |
| August 7, 2006: | Decedent designated Ms. Black as signatory. |
| August 7, 2006: | Decedent designated the account as POD to Mr. Fields. |
| Prior to August 14, 2006: | Linda Fields (now deceased) was added as a signatory. |
| August 14, 2006: | Decedent and Mr. Fields, acting as Decedent's attorney-in-fact, both signed a second designation of the account as POD to Mr. Fields. |
| December 2, 2010: | Decedent again appointed Mr. Fields as his attorney-in-fact. |
| January 27, 2012: | Following Decedent's death, Mr. Fields withdrew $101,000.00 in POD funds. |

March 19, 2012:          Mr. Fields closed the account by withdrawing $91.20 in accrued interest.

Volunteer Federal CD Account Ending 3075

February 16, 2010:       Decedent purchased the CD and designated it as POD to Mr. Fields, whom he previously had appointed as his attorney-in-fact.

December 2, 2010:       Decedent again appointed Mr. Fields as his attorney-in-fact.

January 27, 2012:       Following Decedent's death, Mr. Fields closed the account by withdrawing $128,902.95 in POD funds.

Citizens National Money Market Checking Account

October 18, 1999:       Decedent opened the account. Ms. Black exercised a power of attorney given to her by Decedent to designate herself a signatory.

October 20, 2005:       Decedent appointed Mr. Fields as his attorney-in-fact.

May 4, 2006:       Ms. Black appointed Mr. Fields and Scott Frank as her attorneys-in-fact.

August 7, 2006:       Decedent designated the account as POD to Mr. Fields.

December 2, 2010:       Decedent again appointed Mr. Fields as his attorney-in-fact.

January 26, 2012:       Following Decedent's death, Mr. Fields closed the account by withdrawing $166,745.26 in POD funds.

<u>Citizens National CD Account Ending 678</u>

October 20, 2005:    Decedent appointed Mr. Fields as his attorney-in-fact.

March 6, 2006:     Mr. Fields, acting as Decedent's attorney-in fact, renewed CD, which was designated as jointly owned with right of survivorship by Decedent, Ms. Black, and Mr. Fields.[4]

December 2, 2010:    Decedent again appointed Mr. Fields as his attorney-in-fact.

2011:         Ms. Black died.

January 26, 2012:    Following Decedent's death, Mr. Fields closed the account by withdrawing $47,131.36 as the sole surviving account owner.

<u>Citizens National CD Account Ending 874</u>

August 18, 2009:    Decedent purchased a CD in the amount of $30,000.00 and designated it as POD equally to Mr. Fields and Scott Frank.

December 2, 2010:    Decedent executed a second power of attorney appointing Mr. Fields as his attorney-in-fact.

January 27, 2012:    Following Decedent's death, Mr. Fields closed the account by obtaining two bank checks, one written to him in the amount of $15,011.09 and one written to Scott Frank in the amount of $15,011.10.

At the close of trial, the court found that Mr. Fields did not exercise the power of attorney to make any changes to the ownership or POD status of the Volunteer Federal checking account and that, therefore, no presumption of undue influence was created as

---

[4] The signature card presented for the Citizens National CD account ending in 678 reflects the opening date as March 6, 2006. Ms. Grubb testified that a different CD account was paid out prior to Decedent's death with the account ending in 678 opened in its place. The trial court characterized this as a renewal in the final decree without objection from the parties.

to that account. Specifically, the court found that although Mr. Fields utilized the power of attorney on August 14, 2006, to sign the designation of himself as POD of the Volunteer Federal checking account, this designation actually changed nothing because Decedent himself had executed the same designation on August 7, 2006, and personally signed the August 14, 2006 POD designation as well.

As to the remaining accounts, the trial court found that a presumption of undue influence had been created by the confidential relationship between Decedent and Mr. Fields. However, the court dismissed Plaintiffs' complaint upon finding that Mr. Fields had successfully rebutted the presumption by demonstrating that the transactions were "fair." The court specifically found that (1) Decedent was familiar with POD accounts and had discussed the effects of such accounts with his attorney, (2) Decedent received independent advice from his attorney and bank personnel, (3) Decedent was mentally competent and made his own decisions, (4) the changes made to Decedent's accounts were consistent with the changes he had made throughout the years, and (5) the changes were "something that [Decedent] would have or could have done because he felt Mr. Fields deserved it." The court entered a final decree on March 28, 2016, incorporating the memorandum opinion. The court also extended its prior order directing that all assets subject to this action be maintained in their current form pending the expiration of thirty days or the resolution of an appeal. Plaintiffs timely appealed.

## II. Issue Presented

Plaintiffs present one issue on appeal, which we have restated as follows:

> Whether the trial court erred by finding clear and convincing evidence that Mr. Fields successfully rebutted the presumption of undue influence.

## III. Standard of Review

Our review of the trial court's judgment following a non-jury trial is *de novo* upon the record, with a presumption of correctness as to the trial court's findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 204 (Tenn. 2012). "In order for the evidence to preponderate against the trial court's findings of fact, the evidence must support another finding of fact with greater convincing effect." *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006) (citing *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838

(Tenn. 2002). We review the trial court's conclusions of law *de novo* with no presumption of correctness. *Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011).

## IV. Presumption of Undue Influence

Plaintiffs contend that the trial court erred by finding clear and convincing evidence that Mr. Fields successfully rebutted the presumption of undue influence. Mr. Fields does not dispute the trial court's finding that his relationship with Decedent was a confidential one, raising a presumption of undue influence when he received a benefit while acting as attorney-in-fact for Decedent. Mr. Fields asserts, however, that the trial court properly found that he had rebutted the presumption because the evidence demonstrated that Decedent was of sound mind and following his own free will when he designated Mr. Fields as his attorney-in-fact and, either on his own or acting through Mr. Fields, designated accounts POD or created joint tenancy with right of survivorship. Upon our careful review of the record and applicable authorities, we conclude that the trial court did not err in finding that Mr. Fields had successfully rebutted the presumption of undue influence.

An allegation of undue influence exercised through a confidential relationship may arise in an action contesting the validity of a will. *See Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002) ("[A] will may be challenged on the basis that the decedent was subject to the undue influence of another in executing the will."). In contrast, Plaintiffs in the case at bar assert that Decedent's true wishes were reflected in his 2010 will, which upon Decedent's having been preceded in death by Ms. Black, operated to devise and bequeath 25% of his estate to Ms. Fields with the remaining 75% to be equally divided among Decedent's surviving nieces and nephews: the three Plaintiffs, Mr. Fields, and Scott Frank. Plaintiffs' claim of undue influence is based on the designation of Decedent's checking and CD accounts as either POD in full or in part to Mr. Fields or, in the instance of one Citizens National CD account, as jointly owned by Mr. Fields with right of survivorship. *See In re Estate of Price*, 273 S.W.3d 113, 125 (Tenn. Ct. App. 2008), *perm. app. denied* (Tenn. Sept. 29, 2008) ("Courts apply the doctrine of undue influence 'when one party, such as a grantee, is in a position to exercise undue influence over the mind and the will of another, such as a grantor, due to the existence of a confidential relationship.'") (quoting *Brown v. Weik*, 725 S.W.2d 938, 945 (Tenn. Ct. App. 1983)). Plaintiffs argue that Decedent's will provides evidence that it was not Decedent's intent to pass funds in his checking and CD accounts to Mr. Fields outside the parameters of the estate.

Regarding the presumption of undue influence that may arise upon the finding of a confidential relationship, our Supreme Court has explained:

"Under Tennessee law, as in most jurisdictions, a presumption of undue influence arises where the dominant party in a confidential relationship receives a benefit from the other party." *In re Estate of Hamilton,* 67 S.W.3d 786, 793 (Tenn. Ct. App. 2001) (citing *Matlock v. Simpson,* 902 S.W.2d 384, 386 (Tenn. 1995); *Crain v. Brown,* 823 S.W.2d 187, 194 (Tenn. Ct. App. 1991)). "[A] confidential relationship arises as a matter of law when an unrestricted power of attorney is granted to the dominant party." *Childress,* 74 S.W.3d at 328-29 (citing *Matlock,* 902 S.W.2d at 386); *see also In re Estate of Hamilton,* 67 S.W.3d at 793; *Mitchell* [*v. Smith,*] 779 S.W.2d [384,] 388 [(Tenn. Ct. App. 1989)], 779 S.W.2d at 389 ("A person authorized to act on behalf of another by virtue of an unrestricted power of attorney has a confidential relationship with the person who executed the power of attorney."). No confidential relationship arises when an unrestricted power of attorney is executed but has not yet been exercised. *Childress,* 74 S.W.3d at 329. A power of attorney is restricted and a confidential relationship does not exist as a matter of law when the power of attorney never came into effect and the person granting the power of attorney may alter or revoke it at any time. *McKinley v. Holt,* No. 03A01-9807-PB-00220, 1999 WL 233400, at *4, 1999 Tenn. App. LEXIS 247, at *12 (Tenn. Ct. App. Apr. 15, 1999); *see also Smith v. Smith,* 102 S.W.3d 648, 653 (Tenn. Ct. App. 2002).

Once a presumption of undue influence arises, in order to overcome the presumption, the dominant party must establish that the transaction at issue was fair by clear and convincing evidence. *In re Estate of Hamilton,* 67 S.W.3d at 793. With a will contest, evidence that the testator received independent, legal advice concerning the contents of a will may rebut this presumption. *Id.* (citing *Crain,* 823 S.W.2d at 194). Finally, we are mindful that "the presumption of undue influence extends to all dealings between persons in fiduciary and confidential relations, and embraces gifts, contracts, sales, releases, mortgages and other transactions by which the dominant party obtains a benefit from the other party." *Gordon v. Thornton,* 584 S.W.2d 655, 658 (Tenn. Ct. App. 1979) (citing *Williams v. Jones,* 54 Tenn. App. 189, 388 S.W.2d 665 (1963); *Roberts v. Chase,* 25 Tenn. App. 636, 166 S.W.2d 641 (1942)).

*Parish v. Kemp*, 179 S.W.3d 524, 531 (Tenn. Ct. App. 2005), *perm. app. denied* (Tenn. 2005).

In determining that a confidential relationship had been established through demonstration of Mr. Fields's exercise of the power of attorney in transactions that benefitted him, the trial court made the following findings in relevant part:

> The testimony from Volunteer Federal from Ms. Phillips was that [Decedent] signed his own documents and that [Decedent] made his own decisions, and she never changed anything without talking to [Decedent] personally or on the phone. Sometime after August of 2006, Ms. Linda . . . Fields . . . was added as a signatory, but that wasn't a change in the payable on death part or the ownership of the account. Ms. Phillips also testified that the [Decedent] signatures were signed by [Decedent]. So assuming that, then I don't see the power of attorney being used when it was originally signed on 8/7/06 and changed to Ronald Fields as POD. It wasn't used and therefore would have created a presumption of undue influence until 8/14/06, when it was used for that purpose. But that did not change anything that wasn't already there on August the 7th of '06. So I don't find that that account was created with a payable on death by undue influence.
>
> I think that, and I'm going to go through each of these accounts, on account number 3075 that was opened in 2010, the CD shows [Decedent] signing that card himself, and then signing again a second card with Ronald Fields signing as POA [power of attorney]. That account will be treated like the rest of these accounts that are in '09 at Citizens Bank since Mr. Fields had used the POA in 8/14/06. So for the rest of the accounts that were opened after that where Mr. Fields was added as a payable on death, there is a presumption based on this confidential relationship of undue influence that attaches where Mr. Fields has gotten a benefit after the use of his power of attorney.

On appeal, the parties do not dispute the trial court's findings regarding how and when a confidential relationship was established between Mr. Fields and Decedent. The issue on appeal is therefore narrowed to whether Mr. Fields successfully rebutted, by clear and convincing evidence, the presumption of undue influence.

As the parties note, this Court recently addressed a similar issue in *In re Estate of Davis*, No. E2015-00826-COA-R3-CV, 2016 WL 944143 (Tenn. Ct. App. Mar. 14, 2016). Having affirmed the trial court's finding of a confidential relationship, the *Davis* Court next addressed whether the defendant had rebutted the presumption by proving clearly and convincingly that the transaction was fair. *See id.* at *22 ("Once a confidential relationship between Deceased and Davis [Deceased's mother] was proven,

a presumption of undue influence arose and the burden shifted to Davis to prove by clear and convincing evidence the fairness of the transaction involving the Will.") (citing *Childress,* 74 S.W.3d at 328).

As this Court previously has explained:

> It is rare to find direct evidence of undue influence. [*In re Estate of Maddox*, 60 S.W.3d 84,] 88 [(Tenn. Ct. App. 2001)]. Usually, to prove undue influence, one "must prove the existence of suspicious circumstances warranting the conclusion that the person allegedly influenced did not act freely and independently." *Id.* "The suspicious circumstances most frequently relied upon to establish undue influence are: (1) the existence of a confidential relationship between the testator and the beneficiary, (2) the testator's physical or mental deterioration, and (3) the beneficiary's active involvement in procuring the will." *Id.* at 89. Some other recognized suspicious circumstances are:
>
>> (1) secrecy concerning the will's existence; (2) the testator's advanced age; (3) the lack of independent advice in preparing the will; (4) the testator's illiteracy or blindness; (5) the unjust or unnatural nature of the will's terms; (6) the testator being in an emotionally distraught state; (7) discrepancies between the will and the testator's expressed intentions; and (8) fraud or duress directed toward the testator.
>
> *Mitchell v. Smith*, 779 S.W.2d 384, 388 (Tenn. Ct. App. 1989). "The courts have refrained from prescribing the type or number of suspicious circumstances that will warrant invalidating a will on the grounds of undue influence." *Id.*

*DeLapp v. Pratt*, 152 S.W.3d 530, 540-41 (Tenn. Ct. App. 2004), *perm. app. denied* (Tenn. Nov. 29, 2004); *see also In re Estate of Davis*, 2016 WL 944143, at *21-22. The *Davis* Court found that under the totality of the circumstances, the evidence was clear and convincing that the decedent had decided on the provisions of his will without undue influence by the defendant, who was the decedent's mother. *Davis*, 2016 WL 944143, at *23 ("Whether this decision by the Deceased was 'fair' to his wife and daughters was not the question before the Probate Court or now before this Court on appeal.").

Plaintiffs assert that the combination of (1) a confidential relationship between Decedent and Mr. Fields, (2) Decedent's physical deterioration and blindness, and (3) Mr. Fields's active involvement in procuring his POD designation constituted "suspicious

circumstances" sufficient to defeat Mr. Fields's attempted rebuttal of the undue-influence presumption. We disagree.

In determining that Mr. Fields had successfully rebutted the presumption of undue influence, the trial court stated in its memorandum opinion in pertinent part:

> So with the presumption raised, Mr. Fields has to rebut that presumption in a couple of different ways. Number one, he has to prove that the transaction was fair, that this is something that [Decedent] would have or could have done because he felt Mr. Fields deserved it. Certainly the proof is there in a clear and convincing way that Mr. Fields took care of [Decedent], that Mr. Fields drove [Decedent] around, and notably that Mr. Fields stepped into the shoes of Buena Black and Mable, who previously helped [Decedent], who apparently needed help not mentally, but physically because of the decline in his eyesight. [Decedent] was familiar with payable on death accounts because he had set those up in the past before Mr. Fields became involved, and because Mr. Carson testified as his attorney he had discussed those issues with him and because he also distinguished those accounts from wills, I find that Mr. Fields has produced clear and convincing evidence that Mr. Carson independently advised [Decedent] about the [e]ffects of payable on death accounts and making wills, and that [Decedent] made his own decisions as to who would receive things when he died. [Decedent], as far as all proof that's in the case, received independent advice from both the attorney and from the bank, and this rebutted the presumption of undue influence. Given that, there was the physical condition of [Decedent]. I don't find he was so frail that he was subjected to undue influence. There is no proof that he was tricked because of his eyesight. He was of advanced age but there is no proof from anybody that he did not know who his relatives were . . . what he had and what he wanted to do with things, and there is no proof that he did anything but make his own decisions, and I find that by clear and convincing evidence. There's no proof [Decedent] was under the dominion and control of Mr. Fields. Even the circumstances of his physical decline, his loss of eyesight and his advanced age, those did not weigh in favor of any proof out there, and I find there was none of dominion and control by Mr. Fields. While it is unfortunate for the family that emotionally this doesn't satisfy them that that's what [Decedent] wanted to do, in leaving out part of his family members from his effects, I think he knew what he was doing. He had done it for years. He had changed both of those documents for years. Quite frankly, he went to the attorney on several occasions, probably more than most people do, but not in some way that I would think is exorbitant. I

19

think he went in reaction to things that were happening in his life; for instance, the decline of Buena Black and Mable, his sisters who would help take care of him, and the stepping into that role of Mr. Fields. So for that reason, I'm dismissing the case against Mr. Fields.

As the trial court noted, the issue was not whether the transactions were fair to Plaintiffs but whether the transactions fairly represented Decedent's free and independent will. *See Davis*, 2016 WL 944143, at *23. Plaintiffs argue that Mr. Fields's testimony indicated that he treated Decedent's designation of him as a beneficiary to accounts as payment for the care he provided Decedent. Plaintiffs assert that "[i]t would be incredible to argue that his care was worth in excess of $458,000.00." When questioned regarding what he thought would justify Decedent's leaving the funds to him, Mr. Fields stated, "I took care of him." Contrary to Plaintiffs' assertion, however, Mr. Fields did not characterize Decedent's designation of him as a beneficiary as payment for the care given.

Mr. Fields testified that he enjoyed visiting and providing care to Decedent, stating that Decedent was "like a father" to him. Plaintiffs do not dispute that Mr. Fields spent time caring for Decedent and providing him with transportation. Plaintiffs argue instead that the time Mr. Fields spent with Decedent supports their position that Mr. Fields exerted undue influence. However, the record contains no indication that Mr. Fields ever isolated Decedent from other family members or insisted on being present when others visited Decedent. We determine that the evidence does not preponderate against the trial court's finding that Decedent's decision to designate Mr. Fields as the beneficiary of his financial accounts was reasonably in line with what Decedent may have naturally felt Mr. Fields "deserved."

Plaintiffs rely heavily on Decedent's blindness in later life and the devise and bequest of his estate among nephews and nieces in his 2010 will as demonstrative of suspicious circumstances. In contrast, however, the record clearly and convincingly supports the trial court's finding that Decedent had taken advantage of legal advice on a regular basis in his later years and had consistently updated legal documents such as his wills and powers of attorney with Mr. Carson's assistance. Ms. Phillips and Ms. Grubb each respectively testified to Decedent's longstanding relationship with bank employees at Volunteer Federal and Citizens National. They each opined that Decedent was aware of his financial affairs and competent to make decisions concerning his assets.

Plaintiffs' collective testimony demonstrated that none of them had witnessed signs of mental impairment in Decedent or dependence beyond his need for physical assistance. Tony Frank testified that Decedent "seemed to be in good mental condition." Ms. Hipps stated through deposition testimony that Decedent was a "strong-willed man"

20

and acknowledged during trial that she knew of no instances when anyone had taken advantage of Decedent due to his blindness. Ms. Dodd acknowledged that during the time she knew Decedent, he was of sound mind and independent character. Although Plaintiffs rely on the provisions of Decedent's will in support of their argument that he would not have intended for the majority of his financial accounts to pass to Mr. Fields, each Plaintiff acknowledged through testimony at trial that Decedent had never discussed his financial assets or estate plans with them.

On appeal, Plaintiffs acknowledge that they presented no proof of fraud or duress. Upon our thorough review, we conclude that the evidence preponderates in favor of the trial court's finding, by clear and convincing evidence, that Mr. Fields successfully rebutted the presumption of undue influence.

## V. Conclusion

For the reasons stated above, we affirm the trial court's judgment. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment dismissing Plaintiffs' complaint and collection of costs assessed below. The costs on appeal are assessed against the appellants, Tony Frank, Joyce Dodd, and Teresa Hipps.

_____
THOMAS R. FRIERSON, II, JUDGE